**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**and**

**Teamsters General Local No. 200, Intervening-Petitioner,**

v.

**ADVERTISERS MANUFACTURING COMPANY, Respondent.**

No. 86–2632.

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1987.

Decided June 29, 1987.

---

Marion Griffin, N.L.R.B., Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

Russ R. Mueller, Milwaukee, Wis., for respondent.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and WILL, Senior District Judge.[*]

POSNER, Circuit Judge.

The Labor Board found that Advertisers Manufacturing Company, a maker of advertising materials, had committed a raft of unfair labor practices—25 to be exact—and the Board entered a remedial order which it asks us to enforce. (For a previous round of this litigation see *Advertisers Mfg. Co. v. NLRB*, 677 F.2d 544 (7th Cir. 1982).) The company objects to only a handful of the unfair labor practice findings, and to some parts of the remedy. For the most part the company is merely disagreeing with the Board's evaluation of conflicting evidence and exercise of remedi-

---

[*] Hon. Hubert L. Will, of the Northern District of Illinois, sitting by designation.

al discretion; the futility of such challenges requires no comment. We need discuss only three issues.

1. The first involves the discharge of Carol Hahn, a supervisory employee. A bitterly fought representation campaign, in the course of which the company committed many unfair labor practices, ended on September 12 when a local of the Teamsters Union was elected by a wide margin. On October 2, Ronald Hahn, who is Carol Hahn's son and is not a supervisory employee, was elected chief steward for the local union. Carol Hahn was fired six days later, though she had not engaged in any activities pro or con the union. The Board held that her discharge violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by interfering with her son's right, protected by section 7 of the Act, to engage in concerted activities.

The company argues that Carol Hahn's discharge was planned before the election and therefore before Ronald Hahn's election as shop steward, and for this and other reasons was unrelated to his activities on behalf of the union. This raises a straightforward factual issue that the Board resolved against the company. The Board may have been right or wrong, but its finding that Carol Hahn was fired in retaliation for Ronald Hahn's union activities was supported by substantial (though not abundant) evidence on the record considered as a whole, and is therefore beyond our power to correct.

The company's more interesting argument is that firing a supervisor in retaliation for a relative's union activities cannot violate the National Labor Relations Act. The Taft-Hartley amendments excluded supervisory employees from the protections of the NLRA; as a result, such employees have no statutory right to engage in concerted activities for mutual aid and protection, as nonsupervisory employees do. 29 U.S.C. §§ 152(3), 157, 158; *Wesley v. I.T.O. Corp.*, 739 F.2d 683, 685 (1st Cir.1984). The company notes that in *Parker-Robb Chevrolet, Inc.*, 262 N.L.R.B. 402 (1982), enforced under the name of *Automobile Salesmen's Union Local 1095 v. NLRB*, 711 F.2d 383 (D.C.Cir.1983), the National Labor Relations Board held that discharging a supervisor for pro-union activities does not violate the Act even though "the discharge of a supervisor for engaging in union or concerted activity almost invariably has a secondary or incidental effect on employees," 262 N.L.R.B. at 404 —namely to discourage them from engaging in such activities. See also *ARA Leisure Services, Inc. v. NLRB*, 782 F.2d 456, 459 and n. 3 (4th Cir.1986); *Humana of West Virginia, Inc.*, 265 N.L.R.B. 1056, 1057–60 (1982). The company argues that *Parker-Robb* should control the present case.

It reads too much into *Parker-Robb.* The Board was careful to add there that "the discharge of supervisors is unlawful when it interferes with the right of employees to exercise their rights under Section 7 of the Act, as when they give testimony adverse to their employers' interest or when they refuse to commit unfair labor practices." 262 N.L.R.B. at 404; see also *Boro Management Corp.*, 263 N.L.R.B. 421 n. 4 (1982); *H.H. Robertson Co.*, 263 N.L.R.B. 1344, 1345 (1982). We do not understand the two examples given in *Parker-Robb* to have been intended to be exhaustive. This case provides a third example. If, as the Board found on sufficient evidence, the company fired Carol Hahn because of her son's union activities, there could be only one purpose, and that was to intimidate union supporters—consisting mainly of workers protected by the Act, such as Ronald Hahn himself—by showing the lengths to which the company would go to punish one of them. To retaliate against a man by hurting a member of his family is an ancient method of revenge, and is not unknown in the field of labor relations. For a bizarre instance see *J.P. Stevens & Co.*, 179 N.L.R.B. 254 n. 2 (1969), enforced, 441 F.2d 514 (5th Cir.1971); see also *Golub Bros. Concessions*, 140 N.L.R.B. 120 (1962), and for examples from civil rights law *Soderbeck v. Burnett County*, 752 F.2d 285 (7th Cir.1985), and *Shondel v. McDermott*, 775 F.2d 859 (7th Cir.1985). If the company had fired Ronald Hahn in

retaliation for his election as chief shop steward, there would be no question that it had violated the Act. Instead it fired his mother. If he loves his mother, this had to hurt him as well as her. Cf. *In re Wagner*, 808 F.2d 542, 548 (7th Cir.1986); *CBI Industries, Inc. v. Horton*, 682 F.2d 643, 647 (7th Cir.1982); Becker, *A Treatise on the Family*, ch. 8 (1981). An effective method of getting at him, a protected worker, it is barred by the statute.

*Golub Bros. Concessions* so holds, as do *Consolidated Foods Corp.*, 165 N.L.R.B. 953, 959 (1967), enforcement denied in part, 403 F.2d 662 (6th Cir.1968) (per curiam), and *Dewey Bros., Inc.*, 187 N.L.R.B. 137, 141–42 (1970), enforced without opinion under the name of *NLRB v. General Plastics Corp.*, 457 F.2d 511 (5th Cir.1972), though all three decisions precede *Parker-Robb*. The Board might have noted that enforcement of its order in *Consolidated Foods* was denied, though only because the court of appeals found insufficient evidence that the discharge of the supervisor was actually in retaliation for his wife's union activities. See 403 F.2d at 664. But this is a detail. The Board adequately distinguished *Parker-Robb*, and that was enough to justify its adherence to *Golub Bros. Concessions, Dewey Bros.*, and *Consolidated Foods*. Cf. *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 267, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975); *International Union, United Automobile Workers v. NLRB*, 802 F.2d 969, 974 (7th Cir.1986).

The Board's remedy, however, may seem problematic: forcing the company to reinstate a supervisor. (But see *Howard Johnson Co. v. NLRB*, 702 F.2d 1, 6 (1st Cir. 1983); and see generally Annot., 64 A.L.R. Fed. 398 (1983).) The supervisors are supposed to be on the company's side in labor disputes; that is the essence of *Parker-Robb*. See also *NLRB v. Res-Care, Inc.*, 705 F.2d 1461, 1465–66 (7th Cir.1983); *Wesley v. I.T.O. Corp., supra*, 739 F.2d at 685; H.R.Rep. No. 245, 80th Cong., 1st Sess. 16–17 (1947). It would be anomalous to force the company to reinstate a supervisor who was on the union's side. But as a matter of fact Carol Hahn was, so far as appears, on the company's side. She did not assist in her son's union activities. The company is not being asked to grasp a viper to its bosom. This is another point of distinction from *Parker-Robb:* the supervisors there had aided the union. Carol Hahn is not being reinstated so that she can help the union but so that Ronald Hahn and other protected employees will not be deterred from exercising their rights under section 7 by fear that if they do the company will try to get back at them in any way it can, including by firing their relatives. Of course, the company's action in firing Carol Hahn may have created bitterness and undermined her loyalty, but if so the company has only itself to blame.

2. In the week after the election, the company significantly reduced the work week of employees in some of its sewing departments, and the reductions remained in effect for two months. The Board held that by doing this the company had violated section 8(a)(3) (discrimination in any term or condition of employment, calculated to discourage employees from belonging to a union), as well as section 8(a)(1), of the Act. In the same period the company committed many other acts of retaliation against its workers, not limited to the firing of Carol Hahn. The timing of the reduction in the work week, set against the background of the other retaliatory acts and the company's obvious bitterness at the outcome of the election, persuaded the Board that the reduction was probably due to the company's hostility to the union. The company had then to show if it could that it would have reduced the work week anyway, even if there had been no union in the picture. See *NLRB v. Industrial Erectors, Inc.*, 712 F.2d 1131, 1139–40 (7th Cir. 1983); *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 815–16 (3d Cir.1986).

The company points out that the trend of orders for the products of its sewing department turned down in the third quarter of 1980. So far as appears, however, there was still a backlog in October (although only a short one), when the work week was curtailed. The company argues that it would not have been rational for it to shoot itself in the foot by curtailing the work

week in the sewing department while it had orders to fill. But the long-term benefits of getting rid of the union might compensate for a short-term loss in filling orders more slowly, just as the costs of losing a competent supervisor (Mrs. Hahn) might be offset by the benefits in intimidating the workers by this dramatic act. That is the logic of retaliation; a present cost is traded off against a future benefit from deterring behavior injurious to the retaliator.

We do not know how much flexibility the company had in filling orders. If the orders were not time-sensitive (and evidently not all were), the only cost the company would incur from curtailing the work week would be delay in finishing an order and getting paid for it. A loss in the time value of money is a real loss but not necessarily a bigger loss than the gain from intimidating workers. Furthermore, not every individual or firm is an effective maximizer of its self-interest, and those that are not may be disproportionately represented in litigation. Advertisers Manufacturing Company committed 25 unfair labor practices yet lost the election by a resounding margin and now has signed a collective bargaining agreement with the union. Its "hard ball" tactics may have gained it time or concessions in dealing with the union, but an alternative possibility is that they were dumb tactics which boomeranged.

 3. After the union was certified as exclusive bargaining representative but before the company signed a collective bargaining agreement with it, the company laid off several workers without first negotiating the layoffs with the union. The Board found that this was an unfair labor practice, forbidden by section 8(a)(5) of the Act (refusal to bargain collectively), as well as section 8(a)(1). The company points out that the layoffs were not retaliatory but were motivated by the downward trend in its sales and that collective bargaining agreements invariably authorize the employer to make layoffs when economic conditions warrant. All this is at once true and irrelevant. The rule that requires an employer to negotiate with the union before changing the working conditions in the

bargaining unit is intended to prevent the employer from undermining the union by taking steps which suggest to the workers that it is powerless to protect them. Of course, if the change is authorized by the collective bargaining agreement, it is not in derogation of the union and is not an unfair labor practice. But there was no agreement here. Laying off workers works a dramatic change in their working conditions (to say the least), and if the company lays them off without consulting with the union and without having agreed to procedures for layoffs in a collective bargaining agreement it sends a dramatic signal of the union's impotence. See, e.g., *Local 512, Warehouse & Office Workers' Union v. NLRB*, 795 F.2d 705, 711–12 (9th Cir.1986); *NLRB v. Carbonex Coal Co.*, 679 F.2d 200, 204–05 (10th Cir.1982); *NLRB v. United Nuclear Corp.*, 381 F.2d 972, 976–77 (10th Cir.1967).

It is not a good answer that the company did nothing different from what the collective bargaining agreement, if there had been one, would have permitted it to do, or from what it did before there was a union. The collective bargaining agreement would have prescribed the order in which layoffs, if necessary, would be made, and almost certainly the order would have been the reverse order of seniority. Unions insist on a nondiscretionary order of layoffs so that the company can't lay off the workers it thinks most favorably disposed to the union; and they insist on reverse order of seniority because unions draw their greatest support from older workers. We do not know on what basis the company laid off these seven employees, and specifically we do not know whether they are the seven who would have been laid off under the collective bargaining agreement that the company eventually signed with the union.

 Layoffs are not a management prerogative. They are a mandatory subject of collective bargaining. Until the modalities of layoff are established in the agreement, a company that wants to lay off employees must bargain over the matter with the union. See *Local 512, Warehouse & Office Workers' Union v. NLRB*,

*supra,* 795 F.2d at 711–12. The same is true respecting the company's unilateral change in the method of paying its sewing workers. See *NLRB v. Crystal Springs Shirt Corp.,* 637 F.2d 399, 402–04 (5th Cir. 1981).

ENFORCED.