**TASTY BAKING COMPANY,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 00–1030.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 3, 2000.

Decided June 22, 2001.

Barry Simon argued the cause and filed the briefs for petitioner.

Frederick C. Havard, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Leonard R. Page, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Jeffrey Horowitz, Attorney. Frederick L. Cornnell, Jr. and Steven B. Goldstein, Attorneys, entered appearances.

Before: GINSBURG, RANDOLPH, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Tasty Baking Company (TBC) petitions this court for review of a decision and order of the National Labor Relations Board (NLRB). The Board found that the company committed unfair labor practices in violation of sections (8)(a)(1) and (3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), (3). TBC alleges that part of the complaint filed by the NLRB's General Counsel was time-barred, that the hearing conducted by the Board's Administrative Law Judge (ALJ) was procedurally flawed, that the Board's factual conclusions are unsupported, and that the Board's prescribed remedy is improper. We reject these challenges and grant the Board's cross-application for enforcement of its order.

## I

TBC operates a plant in Philadelphia, Pennsylvania, where approximately 700 workers produce baked goods on daytime and overnight shifts. In 1994, Teamsters Union Local 115 began an organizing drive among TBC employees. The union lost a representation election in April 1995, but, upon the union's objection, the Board set aside the results and ordered a new election in March 1996.

The events forming the basis of the present case began in the summer of 1995, after the first representation election. In mid-June, Production Operations Director Thomas Kenney demoted Edwina Flannery, the wife of well-known union activist and "oven man" Michael Flannery,[1] from the supervisory position she had held for nearly five years. This demotion took place despite management's recent assurances that her position was safe and that she was the company's "newest rising star." Tr. at 185. On August 10, 1995, after Edwina Flannery's demotion, Superintendent Charles Britsch told her that the fact that her husband was outside the plant distributing union literature "was not helping [her] chances of staying on day work," and that if he continued she "could very seriously end up on night work." Id. at 200. Michael Flannery continued leafleting, and a month later the company transferred his wife to the night shift.

On January 16, 1996, Michael Flannery received a disciplinary warning from his supervisor, alleging that Flannery had twice failed to remove crumbs from the crumbs depositor.[2] Flannery filed a written grievance, protesting that it was not his responsibility to remove the crumbs. When Flannery met with Britsch to discuss the grievance on January 18, Britsch said that the warning stemmed from the company's new "get tough" policy. Id. at 124–25. Britsch also said that he and Flannery were "enemies," and that while Flannery might think that he was doing the right thing for the employees, Britsch felt that he (Britsch) was "doing the right thing for Tasty Bake and will do whatever I have to to keep the union out." Id. at 125.

On January 26, 1996, Operations Director Kenney met with an employee, William Martin, to discuss Martin's suggestion that metal detectors be installed at the entrance to the workplace. Kenney told Martin that the suggestion was "stupid," and speculated that Michael Flannery was behind it. Id. at 220. Martin denied this, and then told Kenney that Michael Flannery should not have received the "crumbs" warning because it was Martin's, not Flannery's, responsibility to remove the crumbs from the depositor. Kenney responded that he did not care whose job it was, and "that he had told Mike that if Mike f**ked him, he would f**k Mike back." Id. at 221. Kenney then told Martin that "if you f**k me, I'll f**k you back," and concluded: "[N]ow I'm getting Mike. I told him I was going to do it. Now I'm doing it." Id. at 221–22.

On January 31, 1996, sanitation employee Robert Nolan, another vocal union supporter, received a three-day suspension and was subsequently issued a written warning for "insubordination" resulting from an incident with Linda Casey, a sub-

---

**1.** At TBC, the oven man maintains control of the heat for the ovens, coordinates the oven heating times with the floor monitor and the operator of the crumbs depositor, and ensures that the baked product is carried away on a conveyor belt.

**2.** The crumbs depositor, used in the company's production of crumb cakes, receives crumbs from a chute and deposits them onto cake batter. Crumbs must be removed from the depositor before production can be switched from crumb cakes to cupcakes.

stitute floor monitor. According to Nolan, he had been making a telephone call during his usual break time, when Casey began "yelling and screaming" at him to get off the phone. *Id.* at 278. Nolan told Casey that he was talking to his wife, and asked to see his regular floor monitor. Casey refused to let Nolan explain or see his monitor, and instructed him to get off the phone and return to work, which Nolan did. Nolan testified that thereafter his regular monitor told him not to worry about the incident. Nonetheless, Nolan received a written warning and three-day suspension for insubordination.

On April 11, 1996, Kenney approached Michael Flannery during his shift and said: "[I] don't believe you. After what happened to your wife, you're still pushing the union and calling OSHA [the Occupational Safety and Health Administration]. Are you going to make me fire you?" *Id.* at 127. Two months later, on June 6, 1996, Flannery received a written warning for reporting wrong "oven times" to other employees. Flannery received the warning notwithstanding that he had disputed the allegation and been told that he would merely receive a memo to his file.

Between August 1995 and July 1996, the union filed unfair labor practice charges with the NLRB concerning the above-described events. Those charges resulted in separate complaints filed by the Board's General Counsel, which were eventually consolidated for hearing. The complaints charged that the company had violated sections 8(a)(1) and (3) of the NLRA, which make it an unfair labor practice for an employer: "to interfere with, restrain, or coerce employees in the exercise of" their rights to form, join, or assist labor organizations, 29 U.S.C. § 158(a)(1); *see id.* § 157, and "by discrimination in regard to ... any term or condition of employment to encourage or discourage member-

ship in any labor organization," *id.* § 158(a)(3). After a hearing, the ALJ sustained the complaints with respect to the charges that are the subject of the instant petition, and the company filed exceptions with the Board.

The NLRB affirmed the ALJ's conclusions with minor modifications. *Tasty Baking Co. and Teamsters Union Local 115*, 330 N.L.R.B. No. 80, 2000 WL 127513 (Jan. 31, 2000) (*"Tasty Baking Co."*). The Board found that TBC violated section 8(a)(1) by: (1) telling Michael Flannery that the company had implemented a "get tough policy" in response to his union activities; (2) threatening William Martin with retaliation if he engaged in union activities; and (3) threatening Michael Flannery with discharge because of his union activities and calls to OSHA. The NLRB also found that TBC committed unfair labor practices in violation of sections 8(a)(1) and (3) of the Act by: (1) issuing a written warning to Michael Flannery for the "crumbs" incident; (2) issuing a three-day suspension and written warning to Robert Nolan for alleged insubordination in connection with the telephone incident; and (3) issuing a written warning to Michael Flannery for the "oven times" incident. Finally, the Board found that the company violated section 8(a)(1) by demoting Edwina Flannery from her supervisory position in retaliation for her husband's union activities, and violated sections 8(a)(1) and (3) by transferring Edwina Flannery to the night shift because her husband continued working for the union.

The company petitions for review. It contends that the General Counsel's complaint concerning Edwina Flannery's demotion is time-barred because it was not "closely related" to any charge that was timely filed with the NLRB. TBC also alleges that certain of its procedural rights

were violated during the hearing conducted by the ALJ. The company further argues that substantial evidence does not support any of the Board's findings that the company committed unfair labor practices. Finally, TBC challenges the Board's authority to order reinstatement of Edwina Flannery to her supervisory position.

## II

■ The company contends that the complaint concerning Edwina Flannery's demotion was time-barred under NLRA § 10(b), 29 U.S.C. § 160(b), which states that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge." TBC notes that the NLRB has construed section 10(b) to permit prosecution of an alleged violation that was not timely charged if it is "closely related" to the allegations in a timely filed charge. *See* TBC Br. at 7–8 (citing *Nickles Bakery of Indiana, Inc.*, 296 N.L.R.B. 927, 928 (1989)). TBC contends that the allegation concerning Edwina Flannery's June 1995 demotion fails the "closely related" test.

The initial charge was timely filed on October 16, 1995, and stated that the company had unlawfully "demot[ed] an employee for supporting and associating with the union." J.A. 838. On February 12, 1996, the General Counsel filed a complaint based upon that charge, specifically alleging that Edwina Flannery was demoted from her position as "supervisor" because of the union activities of one of her relatives. J.A. 832. TBC argues, citing *Drug Plastics & Glass Co. v. NLRB*, 44 F.3d 1017, 1021, (D.C.Cir.1995), that the February 1996 complaint was not "closely related" to the October 1995 charge, because the complaint referred to a demoted "supervisor" while the charge had referred to a demoted "employee." TBC notes that these words—"supervisor" and "employee"—have distinct meanings under the NLRA, *see* 29 U.S.C. § 152(3), and it argues that because different legal theories and defenses apply to the demotion of supervisors and employees, the allegations cannot be regarded as "closely related." *See* TBC Br. at 13–16 (citing *Nickles Bakery*, 296 N.L.R.B. 927).

Far from failing the "closely related" test, however, we think the complaint and charge are fairly read—notwithstanding the technical imprecision of the charge—as identifying the very same conduct. The actual thrust of TBC's argument is that the timely charge did not give the company "fair notice of the acts alleged to constitute the unfair labor practice." *Pergament United Sales, Inc. v. NLRB*, 920 F.2d 130, 134 (2d Cir.1990). We conclude that it did.

As the Board explained, the term "employee," used in its generic rather than NLRA-specific sense, can certainly refer to someone employed as a supervisor. *Tasty Baking Co.*, slip op. at 1.[3] Moreover, other allegations in the same timely filed charging document made clear that it was Edwina Flannery who was the referenced "employee." That document alleged that the company had "depriv[ed] an employee of seniority rights" and "transferr[ed] an employee to the night shift"—both of which the company had done to Flannery (and, as far as the record reflects, only to Flannery) soon after it demoted her from her supervisory position. This additional information was more than sufficient to give TBC fair notice of the charge against it. *See NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 349–50, 58 S.Ct. 904, 82 L.Ed. 1381 (1938)

**3.** Indeed, by the time the charge was filed in October 1995, Edwina Flannery had already been demoted and was thus an "employee" in both the generic and NLRA-specific senses.

(holding that the discrepancy between a charge alleging discriminatory refusal to reinstate, and the Board's finding of discriminatory discharge, did not violate the company's due process rights). *Compare Pergament United Sales, Inc.*, 920 F.2d at 135–36 (granting enforcement of an NLRB order where the Board had charged the employer with violating section 8(a)(3), but ultimately found it to have violated section 8(a)(4) with respect to the same employees), *with Lotus Suites, Inc. v. NLRB*, 32 F.3d 588, 592 (D.C.Cir.1994) (denying enforcement where the charge contained only a "boilerplate allegation that the Employer violated § 8(a)(1) and [was] utterly lacking in factual specificity").

## III

TBC next argues that procedural irregularities in the complaint and hearing before the ALJ require us to set aside the NLRB's findings regarding threats Kenney and Britsch made to employees. TBC argues that those findings should be set aside because the General Counsel's complaint did not put the company on notice of the conduct at issue, and because the ALJ improperly sequestered Kenney and Britsch during the proceeding, preventing them from hearing the allegations that union witnesses made against them. TBC claims that these irregularities violated both due process and NLRB rules. We disagree. *See Pergament United Sales, Inc.*, 920 F.2d at 134 (holding that "due process is satisfied when a complaint gives a respondent fair notice ... and when the conduct implicated in the alleged violation has been fully and fairly litigated").

■ The company's principal challenge to the complaint is that it alleged that Kenney and Britsch threatened employees on dates different from those proven at the hearing. The complaint alleged that Kenney made a threat "on or about" January

12, 1996, while the evidence showed that Kenney's threat to William Martin took place two weeks later, on January 26. Similarly, the complaint alleged a threat made by Britsch "on or about" January 24, 1996, while the evidence concerned statements he made to Michael Flannery six days earlier, on January 18. These minor variances in "on or about" dates, however, were insufficient to prejudice the company's hearing preparation. Indeed, courts have permitted variances of the same and greater magnitude between dates charged in criminal indictments and those later proven at trial, notwithstanding that in such cases the defendant's very liberty is at stake. *See, e.g., United States v. Kimberlin*, 18 F.3d 1156, 1158–59 (4th Cir. 1994) (finding nonprejudicial a variance of nearly one month between the date charged in the indictment and that proven at trial); *Robinson v. United States*, 210 F.2d 29, 31 (D.C.Cir.1954) (holding that "[t]here is no material variance between March 16 and 'about March 1'"). Moreover, at the hearing itself, TBC had a full opportunity to cross-examine the General Counsel's witnesses about the circumstances surrounding the threats, and to put Kenney and Britsch on the stand to rebut those witnesses. *See Pergament United Sales, Inc.*, 920 F.2d at 136.

■ The company also challenges the manner in which the ALJ applied the NLRB's sequestration rule, under which an ALJ may exclude witnesses from the hearing room while others are testifying. Exempt from the rule are, inter alia, a party's designated representative and "a person who is shown by a party to be essential to the presentation of the party's cause." *Greyhound Lines, Inc.*, 319 N.L.R.B. 554, 554 (1995); *see* Fed.R.Evid. 615(3) (same). The purpose of the rule is to prevent one witness from "shaping his testimony to match that given by other

witnesses at the trial." *Queen v. Wash. Metro. Area Transit Auth.*, 842 F.2d 476, 481 (D.C.Cir.1988) (citations omitted).

■ TBC selected its Vice President for Human Resources, William Mahoney, as its designated representative to assist in its defense, and the ALJ excepted him from sequestration. The ALJ excluded four other company managers from the hearing room, including Kenney and Britsch. The company argues that the exclusion of Kenney and Britsch was improper, because they were "essential" witnesses. The ALJ retains considerable discretion in determining which witnesses are "essential" within the meaning of the rule, however, and we find no abuse of that discretion here. *Cf. Polythane Sys. v. Marina Ventures Int'l*, 993 F.2d 1201, 1209–10 (5th Cir.1993) (holding that whether a witness is "essential" under Fed.R.Evid. 615 is "a matter soundly within the discretion of the trial court"); *Queen*, 842 F.2d at 482 (same).

Moreover, we are unable to discern any prejudice suffered by the company on account of the sequestration. *See Bricklayers Int'l Union of Am. v. NLRB*, 475 F.2d 1316, 1323 (D.C.Cir.1973) (noting that under 5 U.S.C. § 706, "due account shall be taken of the rule of prejudicial error"). Under the NLRB's rule, "counsel for a party may inform counsel's own witness of the content of testimony . . . given by a witness for the opposing side in order to prepare for rebuttal of such testimony." *Greyhound Lines, Inc.*, 319 N.L.R.B. at 554. In light of company counsel's ability thus to prepare Kenney and Britsch, and of the fact that both men did testify in rebuttal to the General Counsel's witnesses, such prejudice seems highly unlikely. *See Desert Hosp. v. NLRB*, 91 F.3d 187, 190 (D.C.Cir.1996) ("The burden of showing prejudice from assertedly erroneous rulings is on the party claiming injury.").

TBC offers only one example of such purported prejudice. It contends that the ALJ wrongly interpreted Kenney's uncertainty about details of his meeting with Martin as evidence of Kenney's lack of credibility. The true reason for Kenney's uncertainty, the company argues, is that the complaint alleged a meeting date that was off by two weeks, and that the sequestration order prevented Kenney from hearing Martin's description of that meeting. But even if this contention were true, Kenney's uncertain description of the meeting with Martin was the last and least important of the grounds the ALJ gave for doubting Kenney's credibility. The ALJ found Kenney's responses vague with respect to numerous other incidents; found that although he had no difficulty remembering events when questioned on direct examination by company counsel, he had inexplicable failures of memory when under cross-examination; and found Kenney generally "evasive" in responding to questions from the General Counsel. *Tasty Baking Co.*, slip op. at 20. Moreover, in concluding that Kenney had threatened Martin, the ALJ principally relied not on the vagueness of Kenney's testimony, but on the fact that his testimony was inconsistent and at points self-contradictory, while Martin testified "in an honest and truthful manner." *Id.* at 13. In sum, even were the complaint misleading and the sequestration order erroneous, the company could not fairly blame those factors for the ALJ's finding that Kenney unlawfully threatened William Martin.

IV

■ TBC also disputes the Board's findings that the company committed unfair labor practices on the ground that those findings are not supported by sub-

stantial evidence. Our role in reviewing such a claim is limited. *Pioneer Hotel, Inc.*, 182 F.3d at 942. We must uphold the findings of the Board as long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). In making that determination, "we ask only whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion[,]. . . . and we give substantial deference to the inferences drawn by the NLRB from the facts." *Halle Enters., Inc. v. NLRB*, 247 F.3d 268, 271 (D.C.Cir.2001) (citations and internal quotations omitted). Moreover, we "must accept the ALJ's credibility determinations . . ., as adopted by the Board, unless they are patently insupportable." *Gold Coast Rest. Corp. v. NLRB*, 995 F.2d 257, 265 (D.C.Cir.1993) (citations and internal quotations omitted). We apply this standard of review to each of the findings challenged by the company.

## A

■ We first consider TBC's challenge to the Board's findings that three threats made by the company's supervisors to Michael Flannery and William Martin violated section 8(a)(1) of the Act. That section forbids coercive statements that threaten retaliation against employees for the exercise of their rights to organize and to participate in union activities. *See Southwire Co. v. NLRB*, 820 F.2d 453, 457 (D.C.Cir.1987). An employer's statement violates the NLRA if, considering the totality of the circumstances, the statement has a reasonable tendency to coerce or to interfere with those rights. *See Avecor, Inc. v. NLRB*, 931 F.2d 924, 931 (D.C.Cir. 1991).

■ The Board found a section 8(a)(1) violation based upon Britsch's statements to Michael Flannery on January 18, when Flannery met with Britsch to discuss his grievance over the "crumbs" warning. According to Flannery, Britsch told him that the warning stemmed from the company's new "get tough" policy, which had been instituted because too many people were "screwing up." Tr. at 124–25; *see Tasty Baking Co.*, slip op. at 9. Britsch said that Flannery and he were "enemies over this," and that while Flannery might think that he was doing the right thing for the employees, Britsch felt that he (Britsch) was "doing the right thing for Tasty Bake and will do whatever I have to to keep the union out." Tr. at 125; *see Tasty Baking Co.*, slip op. at 9. The ALJ recognized that "if viewed in isolation, Britsch's mention to [Michael] Flannery of a new 'get tough' policy and about people 'screwing up' is arguably subject to more than one interpretation." *Tasty Baking Co.*, slip op. at 14. He concluded, however, that in context, "Flannery could reasonably have construed Britsch's remarks to mean that the warning issued to him was part of Britsch's admitted strategy of doing what it took to keep the Union out, and as a threat that he and other union supporters faced further reprisals under [the] . . . new 'get tough' policy should they persist in their union efforts." *Id.*

■ Although TBC suggests that this conversation may never have occurred, Flannery's testimony—found credible by the ALJ—provides substantial evidence that it did. Indeed, Britsch conceded that the conversation did occur and did not deny the truth of Flannery's version; Britsch simply testified that he did not specifically remember what was said. Tr. at 420; *see Tasty Baking Co.*, slip op. at 14. TBC further contends that if the conversation did occur, it was equally plausible that the references to people "screwing up" and to the new "get tough" policy had nothing to do with union activity. While this may be so, we must uphold the

Board's findings as long as they rest upon reasonable inferences, and we may not reject them simply because other reasonable inferences may also be drawn. *See Halle Enters., Inc.*, 247 F.3d at 271. In this case, the Board's inference that Britsch's statements constituted a threat of anti-union reprisal is a reasonable one.

The second threat found by the Board occurred on January 26, 1996. On that date, William Martin told Kenney that Michael Flannery should not have received the "crumbs" warning, because it was Martin's responsibility as operator of the crumbs depositor, not Flannery's responsibility as oven man, to remove the crumbs from the depositor. According to Martin, Kenney replied that he did not care whose job it was. Kenney said that he "had told Mike that if Mike f**ked him, he would f**k Mike back," and that "[n]ow I'm doing it." Tr. at 221–22; *see Tasty Baking Co.*, slip op. at 13. Kenney also warned Martin that "if you f**k me, I'll f**k you back." Tr. at 221; *see Tasty Baking Co.*, slip op. at 13.

Martin's testimony, judged "honest and truthful" by the ALJ, *Tasty Baking Co.*, slip op. at 13, provides substantial evidence that the conversation occurred as Martin recounted. And Kenney's statement, that actual culpability for the crumbs incident was irrelevant to which employee had been disciplined, supports the ALJ's finding that Martin "could reasonably have concluded, particularly in light of [Michael] Flannery's role as an open and active union adherent, that the [crumbs] warning . . . was linked to [Flannery's] involvement with [the] Union." *Id.* That statement also supports the ALJ's determination that the message to Martin was that "involvement with the Union could lead to unspecified reprisals being taken against him" as well. *Id.*

The final management threat came on April 11, 1996, when, according to Michael Flannery's testimony, Kenney told him: "[I] don't believe you. After what happened to your wife, you're still pushing the union and calling OSHA. Are you going to make me fire you?" Tr. at 127. The ALJ credited Flannery's testimony as "honest and straightforward," and, with the exception of the reference to OSHA, Kenney did not controvert it. *Tasty Baking Co.*, slip op. at 13. Accordingly, we have no doubt that the Board's finding—that Kenney threatened Michael Flannery in violation of section 8(a)(1)—is supported by substantial evidence.

### B

We next consider TBC's challenge to the Board's determinations that the company violated sections 8(a)(1) and (3) by taking disciplinary action against employees Michael Flannery and Robert Nolan. It is well settled that an employer violates the NLRA by taking an adverse employment action, such as issuing a disciplinary warning, in order to discourage union activity. *See Gold Coast Rest. Corp.*, 995 F.2d at 264–65. The central question is the employer's motivation for taking the adverse action, and to make that determination the NLRB employs the so-called *Wright Line* test. *See Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981); *see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401–03, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (approving *Wright Line* test); *TIC–The Indus. Co. Southeast v. NLRB*, 126 F.3d 334, 337 (D.C.Cir.1997) ("*TIC*") (citing *Wright Line*). Under that test, the General Counsel must first "make a prima facie showing sufficient to support the inference that protected [i.e., union-related] conduct was a motivating factor in the . . . adverse action." *TIC*, 126 F.3d at 337 (citations and internal quotations omitted). In de-

termining whether the employer had a discriminatory motive, "the NLRB may 'consider[ ] such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action.'" *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 735 (D.C.Cir.2000) (quoting *Power Inc. v. NLRB*, 40 F.3d 409, 418 (D.C.Cir.1994)). Once a prima facie case has been established, the burden shifts to the company to show that it would have taken the same action in the absence of the unlawful motive. *TIC*, 126 F.3d at 337.

The first adverse action at issue is the January 12, 1996 written warning to Michael Flannery for allegedly failing to empty the crumbs from the crumbs depositor. As the ALJ concluded, the General Counsel had a strong prima facie case that the warning was motivated by Flannery's union activities, given his well-known status as a union activist and the extensive evidence of anti-union animus provided by Kenney's and Britsch's threats, as well as by Britsch's statements to Edwina Flannery. *Tasty Baking Co.*, slip op. at 15. The company, by contrast, was unable to demonstrate that it would have issued the warning absent this motivation. The company conceded that no other employee had "ever been issued a disciplinary warning for failing to clean out a depositor." *Tasty Baking Co.*, slip op. at 9; *see* Tr. at 325. There was also substantial evidence that it was not Flannery's responsibility to empty the crumbs, including the testimony of both Flannery and Martin, as well as documentation showing that it was the function of the depositor operator, not Flannery (the oven man), to remove the crumbs from the depositor. Tr. at 169–70, 221; Gen. Counsel Ex. 14 (J.A. 912–13); *see Tasty Baking Co.*, slip op. at 15. Finally, the coup de grace was Kenney's statement to Martin that he did not care whose job it

was to remove the crumbs, and that he had issued the warning merely to "f**k Mike back." As the ALJ said, this comment "provides near irrefutable evidence that the warning had nothing to do with crumbs being left in the depositor." *Tasty Baking Co.*, slip op. at 15–16.

The second adverse action is the February 5, 1996 warning and suspension of Nolan for alleged insubordination. A replacement floor monitor, Linda Casey, accused Nolan of using the telephone when not on break and of failing to go back to work when asked to do so. The ALJ found a prima facie case of unlawful discrimination, both because Nolan was an open and active union adherent whose union sympathies were well known to TBC, and because there was substantial evidence of the company's anti-union animus, much of which has been described above. As the ALJ correctly determined, whether TBC could rebut that case depended upon whose account of the phone incident was believed. *Id.* at 17. According to Nolan: he had permission from his regular monitor to take a break at the time he was making the call; when Casey saw him, she immediately began screaming at him; and when he asked to see his regular monitor, Casey told him to get back to work, which he quickly did. Tr. at 264–82; *see Tasty Baking Co.*, slip op. at 17. Casey's version was that: she had caught Nolan making a call when he was not on break; she directed him to return to work in a normal tone of voice; and Nolan refused. Tr. at 290–91; *see Tasty Baking Co.*, slip op. at 17. The ALJ found Nolan to have testified in an "honest and truthful manner," while characterizing Casey's demeanor as that of "someone who was willing to slant her testimony to help her employer's cause." *Tasty Baking Co.*, slip op. at 17–18. The ALJ found further evidence that the insubordination claim was a pretext in the fact

that neither Casey nor higher-level supervisors gave Nolan a chance to explain before imposing the warning and suspension, as was required by company policy. *Id.* at 18. In light of the deference we owe to an ALJ's credibility determinations, we affirm the NLRB's finding with respect to this incident. *See Gold Coast Rest. Corp.*, 995 F.2d at 265; *see also Elastic Stop Nut Div. of Harvard Indus., Inc. v. NLRB*, 921 F.2d 1275, 1281 (D.C.Cir.1990) (holding that a reviewing court "must uphold Board-approved credibility determinations of an ALJ unless they are 'hopelessly incredible' or 'self-contradictory'" (citations omitted)).

The final adverse action we consider in this section is the company's June 6, 1996 written warning to Michael Flannery for allegedly giving wrong oven times to other employees. Flannery testified that his supervisor originally told him he would receive only a memo to his file, and that when a performance warning issued instead, the supervisor told him that "the powers that be" had decided a warning was justified because production time had been lost. Tr. at 131; *see Tasty Baking Co.*, slip op. at 10. We agree with the Board's conclusion that the company's repeated statements and threats regarding Flannery provide substantial evidence for a prima facie case of anti-union animus, and we further conclude that substantial evidence supports the Board's determination that the company failed to show it would have disciplined Flannery had he not engaged in union activity. *See Tasty Baking Co.*, slip op. at 16–17. The evidence showed that Flannery was given the oven times by someone else—either a supervisor or fellow employee—and that the company never inquired as to whether the times that person gave Flannery were wrong from the outset. *Id.* at 10–11. This is particularly significant because the person most likely to have given Flannery

the oven times had furnished wrong times to the baking department just one month earlier. Tr. at 392; *see Tasty Baking Co.*, slip op. at 17. Moreover, although the company claimed it issued Flannery a warning because the error had resulted in a loss of production, TBC had no evidence that it actually experienced any such loss. *Tasty Baking Co.*, slip op. at 17.

## C

We now consider TBC's challenge to the Board's conclusions that the company violated the NLRA by demoting Edwina Flannery from her supervisory position, and by subsequently transferring her to the night shift, in retaliation for her husband's union activities.

### 1

■■■ The Board concluded that in June 1995, TBC violated section 8(a)(1) by demoting Edwina Flannery from supervisor to packer because of anti-union animus toward her husband, Michael Flannery. As a matter of law, the Board appropriately concluded that section 8(a)(1) prohibits a company from terminating or demoting a supervisor·because of a family member's union activities. *Id.* at 19–20. This court has recognized the general principle that, although supervisors are not themselves protected by the NLRA, an action taken against a supervisor "is unlawful when it interferes with the right of employees to exercise their rights." *Parker-Robb Chevrolet, Inc.*, 262 N.L.R.B. 402, 404 (1982), *aff'd sub nom. Auto. Salesmen's Union Local 1095 v. NLRB*, 711 F.2d 383 (D.C.Cir.1983); *see Pioneer Hotel, Inc.*, 182 F.3d at 942 (holding that an employer violates section 8(a)(1) when it discharges a supervisor for refusing to commit an unfair labor practice). And courts have approved as well the Board's more specific

conclusion that section 8(a)(1) is violated when an employer takes action against a supervisor in retaliation for a relative's union activities. *See Kenrich Petrochem., Inc. v. NLRB*, 893 F.2d 1468, 1477–78 (3d Cir.1990) ("*Kenrich I*"), *vacated on other grounds by* 907 F.2d 400, 402 (3d Cir.1990) (en banc) ("*Kenrich II*"); *NLRB v. Advertisers Mfg. Co.*, 823 F.2d 1086, 1088–89 (7th Cir.1987). As Judge Posner has explained, to "retaliate against a man by hurting a member of his family is an ancient method of revenge," and retaliation aimed at a relative who is a supervisor can have "only one purpose, and that [is] to intimidate union supporters—consisting mainly of workers protected by the Act . . .—by showing the lengths to which the company would go to punish one of them." *Advertisers Mfg. Co.*, 823 F.2d at 1088.

■ To determine whether TBC violated section 8(a)(1) in this manner, the Board properly applied the *Wright Line* test. *See Tasty Baking Co.*, slip op. at 20. Substantial evidence for the prima facie case included the unlawful threats and warnings issued directly to Michael Flannery—in particular, Kenney's statement to Michael Flannery that Kenney couldn't believe that "[a]fter what happened to your wife, you're still pushing the union." Tr. at 127. The Board also reasonably concluded that the company had failed to rebut this prima facie case by showing that Edwina Flannery would have been demoted absent discriminatory motivation. The company argued that, as part of a reorganization, it had selected Flannery for demotion because, in Kenney's words, she

"couldn't get [the job] done" and her department was the "poorest in the bakery." *Id.* at 457–58; *see Tasty Baking Co.*, slip op. at 20. The ALJ rejected this explanation for a host of reasons.[4] First, the ALJ did not believe Kenney's testimony, noting that he was evasive and inconsistent in his responses and unable to recollect even the year in which employees allegedly made complaints about Flannery's work. *Tasty Baking Co.*, slip op. at 20. Second, the ALJ noted that TBC's written appraisals of Flannery's performance showed that she had consistently met or exceeded the company's expectations for her job as supervisor of the Krimpet department;[5] indeed, she had received a merit increase for her work in 1994. *See* Gen. Counsel Ex. 13 (J.A. 905–08); *Tasty Baking Co.*, slip op. at 20–21. Third, the ALJ pointed out that although Flannery was not the only supervisor with responsibility for her department's performance, the company offered no explanation as to why in that department she alone was singled out for demotion. *Tasty Baking Co.*, slip op. at 21. Finally, the ALJ credited Flannery's testimony that at the end of 1994, a company vice president had assured her that she was the company's "newest rising star." Tr. at 185; *see Tasty Baking Co.*, slip op. at 21.

Following the recitation of these reasons for rejecting the company's *Wright Line* rebuttal, the ALJ cited two other factors that give us some pause. First, the ALJ noted that the company had not produced Edwina Flannery's 1995 performance evaluation. He concluded that such an evaluation must have existed and must have been

---

4. *Cf. Matson Terminals, Inc. v. NLRB*, 114 F.3d 300, 301 (D.C.Cir.1997) (holding that although evidence supported the company's position that the challenged promotions were part of a planned reorganization, substantial evidence also supported the Board's conclusion that the timing of the promotions was

part of an unlawful effort to interfere with unionization).

5. A "Krimpet," not to be confused with the English "crumpet," is a small, sweet, crimped cake, either filled with jelly or topped with butterscotch frosting.

favorable (as the 1994 evaluation had been), else the company would have submitted it into evidence. *Tasty Baking Co.*, slip op. at 21. This conclusion is questionable, as Flannery's 1995 demotion and transfer may have rendered the preparation of her 1995 evaluation moot. Second, the ALJ stated that he was unconvinced that a reorganization had actually taken place, because no documents dated prior to Edwina Flannery's demotion referred to such a reorganization. *Id.* at 22. This conclusion seems weak as well, because reorganizations need not be preceded by documents and because TBC did produce other documents, roughly contemporaneous with Flannery's demotion, that used the word "restructure" in connection with her demotion. TBC Exs. 20–23 (J.A. 1066–69).

■ Notwithstanding the weakness of these last two elements of the Board's reasoning, we will not remand an administrative adjudication where we have no "substantial doubt that the administrative agency would have reached the result it did absent reference" to the questionable factors. *Barnes v. Small*, 840 F.2d 972, 979 n. 6 (D.C.Cir.1988) (citations omitted); *see Puerto Rico Mar. Shipping Auth. v. Fed. Mar. Comm'n*, 678 F.2d 327, 344 (D.C.Cir.1982) ("The essential question on judicial review [is] whether the agency would have come to the same conclusion had it been aware of its error."). We have no such doubt here, both because of the strength of the other record evidence, and because the ALJ expressly relied on that other evidence to reject TBC's *Wright Line* defense before he even considered the two further factors that we found to be questionable. *See Tasty Baking Co.*, slip op. at 21–22.

2

■ More readily disposed of is TBC's challenge to the Board's conclusion that, soon after demoting Edwina Flannery from her supervisory position, the company again violated the NLRA by transferring her to the night shift because of her husband's continued union activity. By that time, of course, Edwina Flannery was a statutory "employee," and hence was herself protected by the NLRA. *See Advertisers Mfg. Co.*, 823 F.2d at 1088.

The Board's case against TBC could hardly have been stronger. Edwina Flannery testified that on August 10, 1995, two months after her demotion, Superintendent Britsch told her that her husband's continued distribution of union literature outside the plant "was not helping [her] chances of staying on day work." Tr. at 200; *see Tasty Baking Co.*, slip op. at 7. According to Flannery, Britsch said that "upper management would interpret this as a slap in the face," because Michael Flannery was continuing his union activities notwithstanding that the company was being "so nice" to her by letting her remain on the day shift. Tr. at 200. If this continued, Britsch warned, she "could very seriously end up on night work *as a result of this.*" *Id.* (emphasis added). Edwina Flannery responded that her husband was a "grown man," and that she could not tell him what to do. *Id.*; *see Tasty Baking Co.*, slip op. at 22.[6] On September 13, 1996, Michael Flannery again distributed union literature outside TBC, and one week later the company transferred his wife to the night shift. *Tasty Baking Co.*, slip op. at 22.

In its defense, TBC explained that when Edwina Flannery was demoted from her

---

**6.** Although Britsch disputed Flannery's description of the conversation, the ALJ declined to credit Britsch's effort to characterize it as nothing more than helpful advice from a "Dutch uncle." *Tasty Baking Co.*, slip op. at 22; *see* Tr. at 419.

supervisory position, she lost her seniority pursuant to established company policy. That loss of seniority, TBC claimed, rendered Flannery eligible only for the night shift. But the company was unable to produce any documentation that such a policy, applicable to Flannery's situation, existed. *Id.* at 22–23. And Britsch himself conceded that, although he believed such a policy did exist, TBC had not consistently applied it to demoted supervisors. Tr. at 423–24; *see Tasty Baking Co.,* slip op. at 22–23. In light of this evidence, the Board reasonably rejected the company's *Wright Line* defense, and concluded that TBC transferred Edwina Flannery to the night shift in retaliation for her husband's continued union activity.

## V

■■■ Finally, TBC alleges that the Board exceeded its remedial power by ordering the company to reinstate Edwina Flannery as a supervisor. We disagree. As a general matter, the Board enjoys "broad discretionary power ... to fashion remedies that effectuate the policies of the Act," and "the Board's exercise of its discretion is subject to quite limited judicial review." *Petrochem Insulation, Inc. v. NLRB,* 240 F.3d 26, 34 (D.C.Cir.2001); *see Kenrich II,* 907 F.2d at 406. Although it might be "anomalous to force the company to reinstate a supervisor who was on the union's side," *Advertisers Mfg. Co.,* 823 F.2d at 1089, there is no evidence in the record that Edwina Flannery was herself a union supporter. Indeed, Flannery's only response to Britsch's denouncement of her husband's activity was that he was "a grown man," and that she could not tell

him what to do. Tr. at 200; *see Tasty Baking Co.,* slip op. at 22. Hence, in Judge Posner's colorful turn of phrase, "[t]he company is not being asked to grasp a viper to its bosom." *Advertisers Mfg. Co.,* 823 F.2d at 1089. Edwina Flannery "is not being reinstated so that she can help the union but so that [her husband] and other protected employees will not be deterred from exercising their rights ... by fear that if they do the company will try to get back at them in any way it can, including by firing their relatives." *Id.* Under these circumstances, reinstatement is an appropriate exercise of the Board's remedial authority. *Id.*[7]

## VI

For the above reasons, we deny TBC's petition for review and grant the Board's cross-application for enforcement of its order.

---

7. *See Kenrich II,* 907 F.2d at 411 ("[W]here a company fires an employee's close relative to punish the employee, that employee is likely to reasonably believe that the employer will go to any lengths to get rid of the union and that the next step in that scheme may be her own discharge. Reinstatement in this situation ... serves to dispel employees' fears and concomitant reluctance to fully exercise their rights, by demonstrating that the law sets boundaries on employers' ability to engage in this sort of conduct with impunity.").