**PETROCHEM INSULATION, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO, Locals 62, et al., Intervenor.

No. 99–1530.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 13, 2000.

Decided Jan. 26, 2001.

Rehearing En Banc Denied April 16, 2001.

Lawrence W. Marquess argued the cause for petitioner. With him on the briefs was Darin L. Mackender.

Heather L. MacDougall and Daniel V. Yager were on the brief of amici curiae LPA, Inc. and Associated Builders and Contractors, Inc.

Anne Marie Lofaso, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Leonard R. Page, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and David S. Habenstreit, Supervisory Attorney.

Peter D. Nussbaum argued the cause and filed the brief for intervenor. With him on the brief was Meera Trehan.

Before: EDWARDS, Chief Judge, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

The National Labor Relations Board found that petitioner committed an unfair labor practice by bringing a RICO suit against unions that opposed construction and other permits sought by non-union contractors. The Board ordered petitioner to pay the legal fees the unions incurred in defending the suit. Because we agree with the Board that the unions' activities were protected by the National Labor Relations Act, and because the Board's finding that petitioner's lawsuit was both unmeritorious and retaliatory is supported by substantial evidence, we deny the petition for review and grant the Board's cross-application for enforcement.

I

In the 1980's, construction unions in Northern California began filing environmental objections to zoning and construction permits sought by non-union developers and contractors. Among other things, the unions objected to inconsistencies between construction proposals and regional development plans, to the failure to prepare required environmental impact reports, and to use permits for facilities that the unions predicted would cause surrounding areas to exceed air pollution limits under the Clean Air Act. An internal union report explained: "we have seen irresponsible companies build projects which have caused more pollution than should be permitted. We are now threatened with construction moratoriums in many counties in California." Report by Tom Hunter & Ray Foreman, Participation in the Permit Process 1 (1987) ("Union Report"). Asserting that "the burden of these moratoriums falls on the construction worker," *id.* at 1, the unions described their goal in the permitting processes as "advocating regulatory action which will force construction companies to pay their employees a living wage, including health and other benefits, and to meet their responsibilities to the community and the environment." *Id.* at 2. A San Francisco newspaper article further explained that to prevent nonunion contractors from continuing to hire out-of-state workers at $10–$12 an hour less than prevailing union wages, "the unions are arguing [to local governments] that the economic rewards of development are lost when local people aren't hired at the prevailing wage. Consequently, environmental shortcomings such as traffic and pollu-

tion should weigh heavy [sic] against such projects being approved, according to the union line of reasoning." *See* Bradley Inman, *Unions Launch Attack on State Homebuilders*, S.F. EXAMINER & CHRON., May 31, 1987, at F1.

A non-union California-based corporation, petitioner Petrochem Insulation, Inc. installs, repairs, and removes thermal insulation in construction and maintenance projects. According to Petrochem, several contractors, seeking to avoid union permit protests, informed Petrochem that it could neither bid for nor perform subcontract work on their Northern California construction projects. In response, Petrochem filed suit in the United States District Court for the Northern District of California, charging that twenty-one named unions, by filing environmental objections, were delaying and "threatening to delay" construction projects "unless and until the project developers and/or general contractors agreed to boycott open-shop contractors such as Petrochem." Compl. at 23, *Petrochem Insulation, Inc. v. Northern Cal. & Northern Nev. Pipe Trades Council*, No. C-90-3628 (N.D. Cal. filed Dec. 20, 1990). According to the complaint, the unions' actions violated section 8(e) of the National Labor Relations Act. 29 U.S.C. § 158(e). Instead of seeking relief under the NLRA, however, the complaint claimed that the union permit objections amounted to criminal extortion under both state and federal law and charged that the extortion in turn constituted a predicate act under the Racketeering and Corrupt Organization Act. 18 U.S.C. §§ 1961–1968. Alleging that the unions had injured Petrochem both by preventing it from obtaining contracts and by damaging its goodwill and business reputation, the complaint sought treble damages pursuant to RICO section 1964(c). 18 U.S.C. § 1964(c).

The district court dismissed the complaint, finding the RICO claims preempted because the alleged predicate act rested on a violation of the NLRA. Order Dismissing Compl. Without Prejudice, *Petrochem Insulation, Inc. v. Northern Calif. and Northern Nev. Pipe Trades Counsel*, No.C-90-3628, slip op. at 12, 1991 WL 158701 (N.D.Cal. filed Apr. 30, 1991). Petrochem sought leave to file an amended complaint realleging the same conduct but claiming this time that the unions had violated sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, in addition to RICO. Petrochem based this RICO claim on a different provision of the NLRA, 29 U.S.C. § 186, which prohibits employers from making payments to unions. Although the district court denied leave to file the amended complaint, finding it facially inadequate, the court permitted Petrochem to file a second amended complaint provided that the company complied with four specific guidelines for pleading antitrust claims. Order Den. Recons. & Den. Leave to File First Am. Compl., *Petrochem Insulation, Inc.*, No.C-90-3628, at 2–3 (N.D. Cal. filed July 30, 1991). The court also instructed Petrochem that should it again allege a RICO violation, its complaint had to conform to the court's "Standing Order re: RICO Actions." *Id.* at 3.

Petrochem filed a second amended complaint, again alleging RICO and Sherman Act violations. The district court dismissed, this time with prejudice, finding that the complaint failed to conform to the court's instructions and was legally inadequate for several other reasons. Mem. & Order Granting Defs' Mot. to Dismiss, *Petrochem Insulation, Inc. v. Northern California and Northern Nevada Pipe Trades Council*, No.C-90-3628, 1992 WL 131162 (N.D.Cal. filed Mar. 19, 1992). The Ninth Circuit affirmed in an unpublished opinion, and the Supreme Court denied certiorari. *Petrochem Insulation, Inc. v. United Ass'n of Journeymen & Apprentices of the Plumbing and Pipe Fitting Indus.*, 8 F.3d 29 (9th Cir.1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 647 (1994).

The NLRB General Counsel then filed a complaint alleging that by bringing a suit "without merit ... to retaliate" against the unions for engaging in concerted activity protected by NLRA section 7, Petrochem committed an unfair labor practice in violation of NLRA section 8(a)(1). 29 U.S.C. § 158(a)(1). Granting the General Counsel's motion for summary judgment, the Board found Petrochem's lawsuit not only without merit but also "motivated by an intent to retaliate against the Unions' protected concerted activity on behalf of its members and other employees." *Petrochem Insulation, Inc.*, 330 N.L.R.B. No. 10, 1999 WL 1065426, at *7 (Nov. 19, 1999). The Board ordered Petrochem to cease filing such lawsuits or otherwise interfering with employees in the exercise of their section 7 rights. The Board also ordered the company to reimburse the unions for the legal expenses they had incurred. *Id.*

Petrochem petitions for review, and the Board, supported by union intervenors, cross-applies for enforcement. The company challenges each of the Board's key findings: (1) that the unions' participation in permit proceedings was protected by section 7; (2) that Petrochem's suit was meritless; (3) that the suit was retaliatory; and (4) that attorneys' fees were warranted. We consider the first of these arguments in Section II and the others in Section III. We affirm Board findings "unless they are unsupported by substantial evidence in the record considered as a whole, or unless the Board acted arbitrarily or otherwise erred in applying established law to the facts." *Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1282 (D.C.Cir.1999) (internal quotations and citations omitted).

## II

We can easily dispose of Petrochem's argument that the unions' permit objections were unprotected by section 7. In relevant part, section 7 states: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

Petrochem first argues that unions, as opposed to employees, enjoy no section 7 rights. In support, it points to the Supreme Court's statement in *Lechmere, Inc. v. NLRB* that "the NLRA confers rights only on *employees,* not on unions or their non-employee organizers." 502 U.S. 527, 532, 112 S.Ct. 841, 117 L.Ed.2d 79 (U.S. 1992). As both the Board and union intervenors correctly respond, however, *Lechmere* holds only that non-employee union representatives have no affirmative NLRA right to trespass on employer property when they could reach the employees through usual off-site channels. Indeed, *Lechmere* goes on to make clear that when employees are inaccessible, non-employee union representatives enjoy section 7 rights to enter employer property. *See id.* at 537, 112 S.Ct. 841. Of course, we face no question in this case of union access to private property. Under such circumstances, the Board has held, as it did here, that it would be a "curious and myopic" reading of the Act's core provisions "to hold that, although employees are free to join unions and to work through unions for purposes of 'other mutual aid or protection,' the conduct of the unions they form and join for those purposes is not protected by the Act." *BE & K Constr. Co.*, 329 N.L.R.B. No. 68, 1999 WL 883851, at *12 (Sept. 30, 1999). We cannot imagine a more reasonable interpretation of section 7. *See Lucile Salter Packard Children's Hosp. at Stanford v. NLRB*, 97 F.3d 583, 592 (D.C.Cir.1996) (assuming that unions possess section 7 rights).

Petrochem next argues that even if unions sometimes enjoy section 7 protection, the Board had no basis for concluding that the petitioning activity in this case "was clearly protected." *Petrochem Insulation,*

*Inc.*, 1999 WL 1065426, at \*4. In so concluding, the Board relied on the unions' statement that they were intervening before state environmental and other regulatory permit proceedings in order to "force construction companies to pay their employees a living wage, including health and other benefits." Union Report at 2. In view of this objective, the Board found the unions engaged in a form of "area-standards activity"—concerted activity protected by section 7 because of the "legitimate interest" unions have in "protecting the employment standards [they have] successfully negotiated from the unfair competitive advantage that would be enjoyed by an employer whose labor cost package was less than those of employers subjected to the area contract standards." *See Petrochem Insulation, Inc.*, 1999 WL 1065426, at \*4 (internal quotation omitted). If successful, the Board found, the unions "would not only expand union job opportunities for current union members but also would improve their ability to bargain for higher wages by mitigating employer resistance based on concerns about being undercut by non-union competitors." *Id.*

According to Petrochem, no record evidence supports the Board's finding that the unions were promoting employment standards they had negotiated in Northern California. In particular, Petrochem argues that because the unions objected to permits before projects had begun, the Board had no idea what wages and benefits actually would have been. Although this is true, we fail to see how the fact that construction had not yet started has anything at all to do with whether, in participating in permitting proceedings, the unions were seeking to protect area standards. Surely nothing in the NLRA prevents unions from obtaining commitments from employers about wages and benefits for future jobs.

Citing a 1973 Board decision, Petrochem also argues that the unions must prove that the terms and conditions of employment maintained by the employers against whom they targeted their area standards activity were below those negotiated by the unions. Because the company failed to make this argument until its reply brief, however, it is not properly before us. *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n. 4 (D.C.Cir.1990) ("We require petitioners and appellants to raise all of their arguments in the opening brief to prevent 'sandbagging' of appellees and respondents and to provide opposing counsel the chance to respond."). Even so, Petrochem itself supplied the very information it now claims is missing. The San Francisco newspaper article, *see supra* at 3, at F1, which Petrochem attached to its answer to the General Counsel's amended complaint to the Board, reports: "the prevailing union wage for plumbers is $22.72 per hour. Hunter [a union official] claims that some contractors are paying 'out-of-state workers $10–$12 an hour.' "

In its final attempt to convince us that the union permit challenges were unprotected by section 7, Petrochem points to NLRA section 8(b)(4)(ii)(B), 29 U.S.C. § 158(b)(4)(ii)(B), which makes it unlawful for labor organizations to "threaten, coerce, or restrain" any person engaged in commerce where "an object thereof" is "forcing or requiring any person ... to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees." *Id.* According to the company, the union petitioning activity violated section 8(b)(4)(ii)(B) because it coerced developers to cease doing business with Petrochem and other non-union companies.

The Board rejected this argument, relying on *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, where the Supreme Court interpreted section 8(b)(4)(ii)(B)'s coercion ban as not barring handbilling that urged consumer boycotts of secondary employers. Any other interpretation of section 8(b)(4), the Court warned, would pose "serious questions ... under the First Amend-

ment." *See* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). Concluding here that petitioning the government qualifies as political expression, the Board stated that "in order to avoid the potentially serious First Amendment problems that would result if the Unions' governmental petitioning were found to constitute 'coercion' under section 8(b)(4)(ii)(B), we shall follow *DeBartolo* and conclude that such conduct is lawful and, hence, protected by the Act." 1999 WL 1065426, at *5. The Board emphasized that it was not deciding "whether the Unions' petitioning could be found to be coercive for 8(b)(4) purposes if, as [Petrochem] alleges, the Unions had filed, or threatened to file, 'sham' petitions and meritless environmental objections with a secondary objective." *Id.* at *5. Pointing out that the California federal district court had found that Petrochem failed to identify a single meritless objection to any construction project, the Board concluded that all of the petitioning was protected by the First Amendment and thus not barred by section 8(b)(4)(ii)(B). Again, we cannot imagine a more reasonable interpretation of the Act. *See NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) (explaining that courts must defer to the NLRB's "interpretation of the NLRA as long as its interpretation is rational and consistent with the statute").

### III

Having found no basis for upsetting the Board's conclusion that the permitting activity was protected by section 7, we turn to Petrochem's arguments that its lawsuit did not violate section 8(a)(1). 29 U.S.C. § 158(a)(1). To constitute an unfair labor practice, Petrochem's lawsuit must have both lacked merit and have been brought to retaliate against the unions' exercise of section 7 rights. *See Summitville Tiles, Inc.,* 300 N.L.R.B. 64, 65, 1990 WL 169075 (1990).

■ Considering the first question—Did the company's lawsuit lack merit?—the

Board relied on *Bill Johnson's Restaurants, Inc. v. NLRB*: "If judgment goes against the employer in the state court . . . or his suit is withdrawn or is otherwise shown to be without merit, . . . the Board may then proceed to adjudicate the . . . unfair labor practice case[, t]he employer's suit having proved unmeritorious. . . ." 461 U.S. 731, 747, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). The Supreme Court, in other words, equates failing in state court with lacking merit, and the Board has found that reasoning applicable to failure in federal court as well. *See BE & K Const. Co.,* 1999 WL 883851 at *8 (finding that there is "no reason not to regard the rulings of the federal courts . . . as equally determinative on the question of whether the [employer's] federal court lawsuit lacked merit"). Applying the *Bill Johnson's* standard here, the Board found Petrochem's suit meritless because the California federal district court dismissed it and the Ninth Circuit affirmed. 1999 WL 1065426, at *4.

Petrochem argues that instead of relying on *Bill Johnson's,* the Board should have applied the more rigorous standard used to determine whether a suit is so baseless as to rob a plaintiff of normal *"Noerr-Pennington"* antitrust immunity. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (defining "sham" litigation as a lawsuit, brought with the intent to interfere directly with the business of a competitor, that is so objectively baseless that "no reasonable litigant could realistically expect success on the merits" and that therefore fails to receive *Noerr-Pennington* immunity). The company bases this argument on a sentence from *Professional Real Estate Investors*: "[B]y analogy to [the antitrust] sham exception, we held [in *Bill Johnson's*] that even an improperly motivated lawsuit may not be enjoined under the National Labor Relations Act as an unfair labor practice unless such litigation is baseless." 508 U.S. at 59, 113·

S.Ct. 1920 (internal quotations omitted). As the Board points out, however, *see Petrochem Insulation, Inc.*, 1999 WL 1065426, at \*3, this passage concerns when an active lawsuit can be "enjoined"; *Bill Johnson's* establishes a different standard for determining whether an adjudicated lawsuit was meritless. *Compare Bill Johnson's*, 461 U.S. at 744, 103 S.Ct. 2161 (finding that baseless litigation can be enjoined as an unfair labor practice), *with id.* at 747, 103 S.Ct. 2161 ("If judgment goes against the employer in the state court, however, or if his suit is withdrawn or is otherwise shown to be without merit, ... the Board may then proceed to adjudicate the ... unfair labor practice case."). Under the standard for adjudicated litigation, like Petrochem's, if the employer lost, the lawsuit is deemed unmeritorious.

We understand that this sets the bar for sham litigation—litigation not protected by the First Amendment—lower than in *Noerr-Pennington* cases; on proof of retaliation, employer suits that are better than baseless under *Noerr-Pennington* (ones for which "there is any realistic chance that the plaintiff's legal theory might be adopted," *id.* at 747, 103 S.Ct. 2161), may evidently be classified as sham litigation after the employer-plaintiff loses. Perhaps the Supreme Court will one day create a uniform standard for sham litigation governing both NLRA and non-NLRA cases (or explain why the First Amendment protects erring litigants less in the NLRA context than others), but until that day the language in *Bill Johnson's* must control.

This brings us to the second question and the only tricky issue in this case: Did Petrochem file its lawsuit to retaliate against the unions for engaging in section 7 protected activities? Answering affirmatively, the Board relied on three factors: (1) Petrochem filed the lawsuit "in direct response" to the unions' participation in the permit proceedings; (2) the lawsuit had no merit; and (3) Petrochem sought RICO and antitrust treble damages instead of pursuing only compensatory damages under the NLRA. *See* 1999 WL 1065426, at \*6.

We agree with Petrochem that the first factor cannot support the Board's retaliatory motive finding. Every lawsuit seeking to recover damages caused by union activity is, by definition, filed "in direct response" to that activity. Yet not all meritless suits against unions or employees amount to unfair labor practices. Otherwise, *Bill Johnson's* would not have required the Board to determine whether unmeritorious lawsuits were filed for retaliatory reasons. Because the Board's directly-in-response-to factor exists in every case, it cannot help distinguish those suits that amount to unfair labor practices from those that do not.

Challenging the second basis for the Board's finding, Petrochem argues that considering the loss of its suit as evidence of retaliatory motive collapses the first prong of the unfair labor practice analysis (lack of merit) into the second (retaliation). This is true, but also precisely what *Bill Johnson's* permits: "The employer's suit having proved unmeritorious, the Board would be warranted in taking that fact into account in determining whether the suit had been filed in retaliation for the exercise of the employees' § 7 rights." 461 U.S. at 747, 103 S.Ct. 2161. Calling this language dicta, Petrochem urges us to ignore it, arguing that it threatens to deter employers from exercising their First Amendment right to petition the government through litigation. We share this concern, particularly if *Bill Johnson's* is read literally to mean, for example, that an employer who files a colorable lawsuit could be guilty of an unfair labor practice simply because the suit happens to lose, and the Board, relying on the loss, concludes that the suit was meritless and therefore retaliatory. We need not face this issue, however, for although we are bound by *Bill Johnson's*, this case does not involve a colorable, or even just an unsuccessful, lawsuit. The Board found

that Petrochem's suit was *utterly* meritless:

> [Petrochem's] lawsuit was found not just to have lacked merit—that would be a charitable characterization of its outcome. The lawsuit's claims did not even get to a jury ... because it was unable to plead a legally cognizable cause of action, notwithstanding that the District Court provided ... three opportunities to do so. This degree of failure undermines [Petrochem's] claim that it filed the suit to defend its legally protectable interests and demonstrates instead its retaliatory purpose.

1999 WL 1065426, at *6 (internal quotations and citations omitted). Thus, whatever merit Petrochem's First Amendment argument might have in the abstract, it has no applicability where, as here, the employer's suit was completely without merit.

Citing a law review article that mentions in one sentence the possibility of RICO and antitrust suits against unions, *see* Stanley J. Brown & Alyse Bass, *Corporate Campaigns: Employer Responses to Labor's New Weapons*, 6 LAB. LAW. 975, 983 (1990), Petrochem asserts that its suit was novel, not baseless. "Novel" may well be one way to describe the company's suit. Novelty, however, is not necessarily inconsistent with meritlessness; indeed, in view of the district court's total rejection of the suit, we agree with the Board that describing it as meritless would be "charitable." Not only did the district court dismiss the company's first two complaints, but the many reasons it gave for dismissing the second amended complaint with prejudice demonstrate that, in the court's view, the suit had absolutely no merit. In particular, the court gave three independent reasons for dismissing the RICO claim: (1) Petrochem's theory that the manner in which the unions collected money to support their petitioning activity somehow violated NLRA section 186 was not only contrary to Ninth Circuit precedent but also unsupported by section 186's text, Mem. and Order Granting Defs' Mot. to Dismiss, at 5–6; (2) even if the unions' activities did violate section 186, Petrochem would nonetheless have lacked standing to challenge such a violation, *id.* at 8; and (3) the company failed to comply with the district court's specific orders for filing RICO claims, *id.* at 11. The court gave two reasons for dismissing the Sherman Act section 1 claim: (1) Petrochem failed to identify the parties to and contents of any alleged contract, combination, or conspiracy in restraint of trade, thus violating the specific instructions the court gave when rejecting the company's first amended complaint, *id.* at 12; and (2) Petrochem failed to plead an injury to competition resulting from the alleged contracts, *id.* at 16. Apparently unconvinced even by the company's allegations of its own injuries, the court noted, "[a]t most, [the complaint] alleges that [Petrochem] could not submit bids to four projects out of the approximately 93 projects identified in the complaint. It does not allege that [Petrochem] actually submitted a low bid, nor that any project awarded [the company] was withdrawn." *Id.* at 17. Dismissing Petrochem's Sherman Act section 2 claim, the court found: (1) the company failed to identify the contractors who allegedly combined with the unions to monopolize the construction market, *id.* at 23; and (2) despite having "premised its monopolization claim upon the theory that [the unions] engaged in sham petitions and baseless environmental objections," and having been warned by the court that it needed to provide factual support for that claim, Petrochem failed to identify a single meritless objection "or allege why such objection should be considered meritless," *id.* at 25.

Had Petrochem offered some reason other than the novelty of its approach to believe that, notwithstanding the district court's firm rejection of its claims, the suit was nevertheless not without merit, we would of course have taken it into consideration. But in the absence of any such explanation and in view of the reasons the district court gave for dismissing Petrochem's complaints, we have no basis for

questioning the Board's assessment of the company's litigation.

Petrochem also challenges the Board's third basis for inferring retaliatory motive: the company's effort to obtain treble damages by trying to convert labor law claims into RICO and antitrust actions. As the Board saw it, seeking treble damages undermined Petrochem's claim that it filed suit not to retaliate, but to "recover the economic losses caused by the Unions' illegal conduct." Pet'r Br. at 40. The Board explained:

> It was the selection of the RICO and antitrust claims, with their provisions for treble damages, which underscores the [company's] retaliatory intent. [Petrochem] had available a less drastic means of recovering its alleged losses; it could have filed suit in Federal district court under section 303 of the Act to recover its actual damages by alleging as unlawful what it now argues was unprotected conduct, i.e., that the Unions' conduct violated section 8(b)(4). Instead, its RICO and antitrust claims constituted an attempt to obtain three-times its actual damages. In comparable circumstances where an employer has sought punitive damages in addition to alleged actual damages, the Board has inferred retaliatory intent. We draw the same inference here.

1999 WL 1065426, at *6 (citations omitted).

Petrochem argues that the Board should not have drawn any inferences from its decision to seek a remedy expressly authorized by federal law. Had this been the sole basis for the Board's decision, Petrochem's argument might have some appeal. The record is clear, however, that the Board did not rely solely on Petrochem's request for treble damages. The Board specifically stated that "retaliatory motive can be inferred, *in part*, from the treble damages [Petrochem] sought." *Id.* (emphasis added). Because the Board's principal finding was that Petrochem's suit was utterly meritless, it was not improper for the Board to cite the company's decision to seek treble damages as *additional* evidence of retaliatory motive. *Cf. Diamond Walnut Growers, Inc. v. NLRB*, 53 F.3d 1085, 1089 (9th Cir.1995) (finding the fact that an employer sought punitive damages in its suit against a union to be evidence that the suit was retaliatory); *Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 235 (9th Cir.1974) (characterizing antitrust treble damages as punitive).

Given the special deference we owe NLRB findings of motive, *Reno Hilton Resorts*, 196 F.3d at 1282 (citing *Laro Maintenance Corp. v. NLRB*, 56 F.3d 224, 229 (D.C.Cir.1995)), we find the lawsuit's complete lack of merit together with Petrochem's effort to obtain treble damages sufficient to support the Board's finding of retaliatory motive. Of course, were the circumstances different—for example, had the suit not been so meritless—our view might be different. *See NLRB v. International Union of Operating Engineers, Local 520*, 15 F.3d 677, 679–80 (7th Cir.1994) (finding that although the employer's original lawsuit was ultimately dismissed on the basis of a privilege and so was deemed meritless under *Bill Johnson's*, the suit was not retaliatory because it was not entirely without merit). But on the facts of this case, we have no basis for upsetting the Board's determination that Petrochem filed suit in retaliation for the unions' exercise of section 7 rights.

■ Last, Petrochem challenges the requirement that it "reimburse the Unions for all legal and other expenses incurred in defending against [Petrochem's] lawsuit." 1999 WL 1065426 at *7. Section 10(c) of the NLRA authorizes the Board, upon finding an unfair labor practice, to "take such affirmative action ... as will effectuate the policies of [the Act]." 29 U.S.C. § 160(c). Not only does the Board have broad discretionary power under this section to fashion remedies that effectuate the policies of the Act, but the Board's exercise of its discretion is subject to quite limited judicial review. *See Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). We will not disturb a remedy or-

dered by the Board "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *See Virginia Elec. & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943).

■ Petrochem argues that the fee award violates the "American rule," under which "attorney's fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor." *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 717, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). As the Board correctly explains, however, the fee award in no way conflicts with the American rule because the award responds not to the company's loss of its suit, but to the fact that the suit itself amounted to an "illegal act." *See Local 32B–32J, Serv. Employees Int'l Union v. NLRB,* 68 F.3d 490, 496 (D.C.Cir.1995) (finding that an award of attorneys fees did not violate the American rule because the litigation that the fees were incurred in defending against was itself illegal); *Gibson Greetings, Inc. v. NLRB,* 53 F.3d 385, 394 (D.C.Cir.1995) ("The NLRB can award a union the costs and fees it incurs in defending against an employer's baseless, retaliatory lawsuit . . . if it determines that the filing or maintenance of the lawsuit was an unfair labor practice."). Indeed, *Bill Johnson's* expressly authorizes the Board to award attorneys' fees in just such situations: "If [a labor law] violation is found, the Board may order the employer to reimburse the employees whom he had wrongfully sued for their attorney's fees and other expenses." 461 U.S. at 747, 103 S.Ct. 2161.

### IV

We deny Petrochem's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*