# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 17, 2006          Decided May 8, 2007

No. 05-1396

VENETIAN CASINO RESORT, L.L.C.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS,
INTERVENOR FOR RESPONDENT

———

Consolidated with
05-1439

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

*John J. Manier* argued the cause for petitioner. With
him on the briefs was *Richard S. Rosenberg*.

*Richard A. Cohen*, Senior Attorney, National Labor
Relations Board, argued the cause for respondent. With him on
the brief were *Ronald E. Meisburg*, General Counsel, *John H.*

*Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *David S. Habenstreit*, Attorney.

*Michael T. Anderson* argued the cause for intervenor. With him on the brief were *Richard G. McCracken* and *Joni S. Jacobs*.

Before: RANDOLPH, GARLAND and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: In response to a union demonstration on its sidewalk, the Venetian Casino Resort, LLC ("Venetian") took actions that the National Labor Relations Board ("NLRB" or "Board") concluded were unfair labor practices that violated section 8(a)(1) of the National Labor Relations Act ("NLRA" or "Act"). The Venetian broadcast a message over loudspeakers warning the demonstrators that they were committing criminal trespass, attempted a "citizen's arrest" of a union official, and asked the police to keep the demonstrators off the sidewalk. In this petition for review of the Board's order, the Venetian argues that its conduct, which we conclude the Board reasonably found was intended to interfere with a lawful demonstration, was nevertheless protected by the First Amendment. We conclude that the broadcast message and the attempt to arrest the union official were not so protected and therefore affirm the Board's decision on those points. Because the Board failed to address whether the First Amendment protected summoning the police, we remand this matter to the Board to address that question.

**I.**

The Venetian is a luxury hotel and casino in Las Vegas, Nevada built in 1999 on the site along Las Vegas Boulevard (commonly known as "the Strip") where the Sands Casino and Hotel once stood before it was razed to make way for the new resort. To accommodate the projected increase in vehicle traffic that the Venetian would attract, Clark County, Nevada expanded Las Vegas Boulevard by one lane, displacing the public sidewalk that previously ran in front of the Venetian's property. The Venetian agreed to build another sidewalk on its property running parallel to the new lane in Las Vegas Boulevard. In February 1999, when the public sidewalk was demolished to make way for the new lane in the boulevard, a temporary walkway was built where the new sidewalk would eventually run. At about the same time, it was reported in the local media that the Culinary Workers Union, Local 226 and Bartenders Union, Local 165 (collectively, "Union") planned to hold a rally on the temporary walkway protesting the fact that unlike the Sands, its predecessor on the site, "the Venetian did not have a union contract." Official Record of Proceedings Before the National Labor Relations Board at 28, Venetian Casino Resort, LLC, 28-CA-16000 (April 3, 2003) [hereinafter Record of Proceedings]. A local newspaper described the demonstration as an element of the Union's "escalating labor battle" with the Venetian. Jeff German, *Sidewalk Showdown Set*, LAS VEGAS SUN, Feb. 23, 1999, at 1A. Although the Venetian had not yet begun hiring staff at the time of the demonstration, it had assembled an employment package for employees that, according to the Venetian's owner, was superior to the Union's. *Id.* It also would shortly begin the hiring process.[1]

---

[1] The Venetian opened for business in early May of 1999, and began hiring employees several weeks prior to opening. Record of Proceedings at 94.

The Venetian endeavored to prevent the union demonstration from taking place on the walkway. *Venetian Casino Resort, LLC*, 345 N.L.R.B. No. 82 (2005), 2005 WL 2451997 at *6. A representative of the Venetian met with the Clark County District Attorney to press the argument that the Union had no right to use the sidewalk for a demonstration because it was the Venetian's property. Record of Proceedings at 137-40. Prior to that meeting, the District Attorney publicly stated that the walkway was only "quasi-private" property, and that it was "unclear" whether the Venetian had the right to block or remove demonstrators from using it. Adrienne Parker, *Bell Sees Dispute on Venetian Sidewalks Going to Fed Court*, LAS VEGAS SUN, Feb. 25, 1999, at 1A. At the meeting, the District Attorney explained that his office would not enforce the Nevada trespass statute against the demonstrators. Record of Proceedings at 140. In a subsequent conversation with the Las Vegas Police Department, the Venetian's representative was told that the police would not arrest any of the demonstrators for trespass. *Id.* at 141.

The demonstration took place on March 1, 1999. The Venetian marked its property boundaries on the walkway with bright orange paint and posted signs stating that the walkway was private property. More than 1,000 demonstrators, many wearing T-shirts, buttons, and pins with union messages, marched on the walkway. The demonstrators repeatedly chanted slogans, including, "Venetian no, Union yes," "Hey, hey, ho, ho, Union busting[']s got to go," and "Who owns the sidewalk? Union sidewalk." *Venetian*, 2005 WL 2451997, at *6. Some carried picket signs with the words "UNION RIGHTS/CIVIL RIGHTS/ONE AND THE SAME" at the top and the bottom and a photograph of the Venetian's owner in the middle, under which was written, "PRIVATE SIDEWALK." *Id.* Speeches at the demonstration addressed the brewing labor dispute between the Union and the Venetian. *Id.* One of the speakers declared

that the Venetian should be operating the new resort "one hundred percent Union." *Id.* Another complained that the Venetian would not be giving preferred treatment in its hiring to former employees of the unionized Sands. *Id.* Throughout the demonstration, the Venetian repeatedly played a recorded message over a public address system that referred to the demonstrators as "culinary and union workers" and claimed that they were subject to arrest for trespassing on private property. *Id.* at *7. Representatives of the Venetian asked the police to issue criminal citations to the demonstrators and to block them from the walkway. *Id.* Security guards for the Venetian also told the demonstration's leader, union agent Glen Arnodo, that he was being placed under "citizen's arrest." *Id.* The guards did not attempt to take Arnodo into custody, but the following day, representatives of the Venetian contacted the police and reported the "arrest."[2] *Id.*

Three days after the demonstration, on March 4, 1999, the Venetian filed a complaint in federal district court seeking declaratory and injunctive relief against Clark County officials, the Las Vegas Police Department, and the Union, claiming that

---

[2] Nevada law provides for what is commonly referred to as a citizen's arrest:

> A private person may arrest another:
> 1. For a public offense committed or attempted in his presence.
> 2. When the person arrested has committed a felony, although not in his presence.
> 3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it.

NEV. REV. STAT. § 171.126.

their conduct converted the Venetian's private property into a public forum in violation of the Takings Clause of the Fifth Amendment. The district court rejected this argument holding that because the walkway performed an essential public function the Venetian could not lawfully restrict the demonstrators' exercise of their First Amendment rights. *See Venetian Casino Resort v. Local Joint Executive Bd.*, 45 F. Supp. 2d 1027 (D. Nev. 1999). On appeal, the Ninth Circuit affirmed. *See Venetian Casino Resort v. Local Joint Executive Bd.*, 257 F.3d 937 (9th Cir. 2001). The Supreme Court denied the Venetian's petition for a writ of certiorari. *See Venetian Casino Resort v. Local Joint Executive Bd.*, 535 U.S. 905 (2002).

On January 23, 2003, the NLRB Regional Director issued a complaint alleging that the Venetian violated section 8(a)(1) of the Act by (1) summoning the police to cite the demonstrators for trespass and to block them from the walkway; (2) playing the trespass warning over a loudspeaker system; and (3) attempting to place union agent Arnodo under "citizen's arrest."[3] Complaint and Notice of Hearing (Jan. 23, 2003). An administrative law judge ("ALJ") tried the case on April 3, 2003 and issued a decision on June 12, 2003. The ALJ held that because the walkway was a public forum and the demonstrators were engaged in NLRA protected activity, the Venetian committed an unfair labor practice in violation of the Act when it interfered with the demonstration. *Venetian*, 2005 WL

---

[3] Paragraph 5(b)3 of the January 23, 2003, complaint initially read that the Venetian, "caused to be filed a criminal trespass complaint against union agent Glen Arnodo." It was amended at the hearing before the administrative law judge to read that the Venetian, "[i]nformed union business agent Glen Arnodo that he was being placed under citizen's arrest, and the following day contacted the Las Vegas Metropolitan Police to make a report of the incident." Record of Proceedings at 167.

2451997, at *17. The ALJ rejected the Venetian's argument that its activities were protected by a First Amendment right to petition because it found that the Venetian's conduct was not "incidental to and inextricably intertwined with its lawsuit." *Id.* at *16. On September 30, 2005, the Board affirmed the ALJ's decision. *Id.* at *1. The Venetian filed a timely petition for review, and the Board filed a cross-application to enforce its order.

**II.**

We will uphold the Board's decision that the Venetian's efforts to disrupt the demonstration were unfair labor practices if the Board's factual findings are "supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 160(e)-(f), and if its interpretation of the Act is "reasonable and consistent with applicable precedent," *Fashion Valley Mall, LLC v. NLRB*, 451 F.3d 241, 243 (D.C. Cir. 2006). Section 8(a)(1) of the NLRA provides that it is "an unfair labor practice . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7] . . . ." 29 U.S.C. § 158(a)(1). Our analysis begins with the question whether the demonstration was protected by section 7. Affording employees their section 7 rights is "one of the fundamental purposes of the Act." *Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1170 (D.C. Cir. 1998). Determining what conduct falls within "the scope of § 7 'is for the Board to perform in the first instance as it considers the wide variety of cases that come before it.'" *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984) (quoting *Eastex, Inc. v. NLRB*, 437 U.S. 556, 558 (1978)).

Section 7 provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the

purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. [4] In *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978), the Supreme Court explained that section 7 "protect[s] concerted activities for the somewhat broader purpose of 'mutual aid or protection' as well as for the narrower purposes of 'self-organization' and 'collective bargaining.'" The Court found that the "mutual aid or protection" clause extends section 7's reach to include employee efforts to "improve terms and conditions of employment or otherwise improve their lot as employees," *id.*, but noted that the scope of the clause is not so broad as to protect a concerted activity whose relationship to "employees' interests as employees" is "so attenuated that [it] cannot fairly be deemed to come within the 'mutual aid or protection' clause." *Id.* at 568. This Court has read that limitation to require the showing of a "nexus" between the activity and "employees' interests as employees." *See Tradesmen Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1141 (D.C. Cir. 2002) (noting that "an essential element before section 7's protections attach is a nexus between one's allegedly protected activity and 'employees' interests as employees'" (quoting *Eastex*, 437 U.S. at 567)); *cf. Petrochem Insulation, Inc. v. NLRB*, 240 F.3d 26, 30 (D.C. Cir. 2001) (a union's filing of environmental objections to the applications for zoning and construction permits made by non-union construction companies was protected because it was an attempt to force the non-union

---

[4] Section 7 states in full: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title." 29 U.S.C. § 157.

employers to conform to area wage and benefit standards, which would benefit union members by increasing their job opportunities and improving their bargaining power for higher wages). The Venetian argues that the required "nexus" between the demonstration and "employees' interests as employees" is not present because the demonstration was not about labor practices or employment standards, but was only a challenge to the Venetian's property rights to the sidewalk. The Venetian points to press reports that described the demonstration as an attempt to "take back the sidewalk," and cites some of the demonstrators' handbilling and chants that disputed the Venetian's claim to exclusive use of the sidewalk. Petitioner's Reply Br. at 12-13.

But both the ALJ and the Board concluded that the primary focus of the demonstration was in fact, the protection of employees' rights. The Board, quoting the ALJ, reasoned as follows:

> "Having been unsuccessful at [obtaining] a 'neutrality agreement,'[5] the Union obviously decided to take its 'labor dispute' directly to prospective employees and to the general public." The "message" it sought to convey to potential employees . . . was "that the facility should be operated under a union contract and, that if hired by the [Venetian], these new employees should become union members and

_____

[5] A "neutrality agreement" is an arrangement between an employer and a union whereby the "employer agrees that during a union's organizational campaign, it will remain neutral and not express opposition to its employees' selection of union representation." *In re Brylane, L.P.*, 338 N.L.R.B. 538, 540 n.4 (2002).

> support the Union." The judge also found that the Union sought to convey a message to members of the general public, namely "to educate them as to the nature of the Union's dispute with the [Venetian]."

*Venetian,* 2005 WL 2451997, at \*1 (first alteration in original). The district court that heard the Venetian's motion to enjoin further demonstrations agreed. "On March 1, 1999, Defendants Local Joint Executive Board of Las Vegas, Culinary Workers Union, Local No. 226, and Bartenders Union, Local No. 165 . . . staged a demonstration rally including picketing on the temporary pedestrian walkway to *protest the Venetian's employment practices.*" *Venetian Casino Resort*, 45 F. Supp. 2d at 1029 (emphasis added). Many of the picket signs, the chants, and the speeches spoke of labor rights and the Union's demand that the Venetian hire union employees. Although access to the walkway was an element of the dispute and one purpose of the demonstration, we agree with the ALJ and the Board that "the central message, which members of the public received from the demonstration, was that there was a 'labor dispute' between the Union and the Venetian." *Venetian,* 2005 WL 2451997, at \*12.[6]

Because the demonstration was an effort to communicate its "labor dispute" to the public and an attempt to enlist the support of prospective employees in accomplishing its goal of getting the Venetian to "operate[] on a union basis," *Venetian,* 2005 WL 2451997, at \*1 n.4, we conclude that the

---

[6] Communicating a labor grievance to the public is an effective means of inducing employer action. *See generally Local Union No. 501, Int'l Bhd. of Elec. Workers v. NLRB*, 756 F.2d 888, 894-95 (D.C. Cir. 1985) ("Both the Board and the courts have [] recognized that communicating a grievance to members of the public is an important aspect of area standards picketing.").

connection between the demonstration and "employees' interests as employees" was not "so attenuated that [it] cannot fairly be deemed to come within the 'mutual aid or protection' clause" of section 7." *Eastex*, 437 U.S. at 568. In fact, the nexus was clear and distinct. With the deference we afford the Board in determining what conduct falls within the scope of section 7, we hold that it was reasonable for the Board to conclude that the demonstration was entitled to section 7 protection because it was an effort to provide for the "mutual aid or protection" of employees.

Even so, the Venetian argues, section 7 is no help to the demonstrators because its protection of union activity is "wholly derivative" of employees' rights under the statute. Because the Venetian had yet to hire employees that "the Union was interested in representing," *Venetian,* 2005 WL 2451997, at *11, there was no one, the argument goes, from whom the demonstrators could derive section 7 rights.[7] Petitioner's Br. at 30. The Board, however, was not troubled by the fact that the Venetian had not yet begun hiring employees. Neither are we. The Venetian reads the scope of section 7 too narrowly. There is nothing in the language of section 7 that limits its protection

---

[7] The Venetian quotes language from *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992), to suggest (somewhat half-heartedly it seems) that unions do not enjoy section 7 rights. *See Lechmere*, 502 U.S. at 532 ("[T]he NLRA confers rights only on *employees*, not on unions or their nonemployee organizers.") (emphasis in original). We faced this argument in *Petrochem*, and found that "it would be a curious and myopic reading of the Act's core provisions to hold that, although employees are free to join unions and to work through unions for purposes of 'other mutual aid or protection,' the conduct of the unions they form and join for those purposes is not protected by the Act." 240 F.3d at 29 (quotation marks and citation omitted). The Venetian's argument that unions do enjoy "derivative" rights concedes as much.

to the employees of the targeted employer. In fact, it is well established that section 7 protects employees other than those of the targeted employer. *See Int'l Alliance of Theatrical & Stage Employees v. NLRB*, 334 F.3d 27, 32 (D.C. Cir. 2003) ("The Supreme Court and this Court have, consistent with the Act's expansive definition covering '*any* employee,' broadly interpreted the term 'employee,' holding it to include individuals outside direct employment relationships, such as job applicants . . . ."). Even though at the time of the demonstration the Venetian had not yet begun filling jobs the Union had targeted, it was on the verge of doing so. Record of Proceedings at 94. The resort would open for business only two months after the demonstration. *Id.* Less than one week before the demonstration, it was reported in the press that the Venetian's owner had announced that he had "put together a wage and benefit package for Venetian employees." Jeff German, *Sidewalk Showdown Set*, LAS VEGAS SUN, Feb. 23, 1999, at 1A. The Venetian had already begun hiring managerial, clerical, and security personnel, and would shortly begin filling the remaining jobs. Record of Proceedings at 94. The "employees" whose interests the Union was seeking to advance were the prospective employees who would be seeking those jobs, including the former Sands workers who wanted "priority hiring rights at the facility." *Venetian,* 2005 WL 2451997, at *2 n.4. Moreover, the Venetian's argument is at odds with our opinion in *Petrochem* where we found that a union was engaging in protected section 7 activity even though the company it had targeted with its concerted activity had not begun hiring for the projects on which the permits were based. 240 F.3d at 30 ("Surely nothing in the NLRA prevents unions from obtaining commitments from employers about wages and benefits for future jobs.").

For its final argument that section 7 does not protect the demonstrators, the Venetian turns again to language in *Lechmere, Inc. v. NLRB*. In *Lechmere*, the Board concluded

that an employer had committed an unfair labor practice by barring union organizers from handbilling in its parking lot. 502 U.S. at 532-33. The Court reversed the Board and held that it was not an unfair labor practice for the employer to exclude nonemployee union organizers from its property "except in the rare case where the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels." *Id.* at 537-38 (emphasis and internal quotations omitted). The Venetian reads *Lechmere* to support its argument that its efforts to deny the union demonstrators access to the sidewalk constituted a permissible exercise of its own property rights. But Venetian's argument misses a fundamental point of *Lechmere*. *Lechmere* allows an employer the right to deny access to its premises only where it has a property right to do so, and as the Ninth Circuit held, the Venetian has no property right to the sidewalk that permits it to prevent people, like the demonstrators here, from exercising their First Amendment rights by airing to the public and to prospective employees grievances about the Venetian's employment practices. We have seen this issue before and the Board's analysis is consistent with our own. In *United Food & Commercial Workers International Union Local 400 v. NLRB*, 222 F.3d 1030 (D.C. Cir. 2000), we addressed the question whether a grocery store was permitted to exclude union organizers from sidewalks in front of its stores. We adopted the Board's reasoning in *Indio Grocery Outlet*, 323 N.L.R.B. 1138, 1141 (1997), *enforced*, 187 F.3d 1080 (9th Cir. 1999), that "for exclusion to be lawful, 'there is a threshold burden on the [employer] to establish that it had, at the time it expelled the Union representatives, an interest which *entitled* it to exclude individuals from the property.'" *United Food*, 222 F.3d at 1034 (quoting *Indio*, 323 N.L.R.B. at 1141) (internal quotation marks omitted and emphasis in original). In *United Food*, the employer lacked such a property right and we held that its expulsion of the union representatives from the sidewalks

violated their section 7 rights. The case before us is indistinguishable. The Venetian, like the grocery store chain, lacks "the requisite property interest" that would permit it to exclude the union organizers. *United Food*, 222 F.3d at 1035.

Not surprisingly, the Venetian urges us to disregard the Ninth Circuit's holding that the Venetian lacked a property right in the sidewalk sufficient to permit it to exclude the demonstrators. Petitioner's Br. at 40. ("Venetian submits the[] decision [was] erroneous and should not be followed by this Court."). The doctrine of issue preclusion prevents us from doing so. *See Consol. Edison Co. of N.Y. v. Bodman*, 449 F.3d 1254, 1257-58 (D.C. Cir. 2006) ("Under the doctrine of issue preclusion, binding effect is to be given to the first resolution of an issue.") (internal quotation marks, alteration and citation omitted). In *Beverly Health & Rehab. Servs. v. NLRB*, 317 F.3d 316, 322-23 (D.C. Cir. 2003), we denied a similar request to disregard a sister circuit's decision and outlined the familiar and long-settled standards for determining the preclusive effect of an earlier holding:

> First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case . . . . Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination. An example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude.

*Id.* (citation and quotation omitted). All three requirements are fully met here. The Ninth Circuit considered the very argument the Venetian urges us to reconsider here, and clearly and conclusively rejected it. *See Venetian Casino*, 257 F.3d at 948. We can find no basis to conclude that there would be any unfairness to the Venetian in applying the determination of the Ninth Circuit. We can discern no difference between the incentives that the Venetian may have had in its Ninth Circuit litigation and its incentives here. The stakes in its attempt before that court were no less than they are now.

The foregoing discussion showing that the demonstrators were protected by section 7 serves as a lengthy prelude to the central question of this appeal, which can now be phrased easily and answered succinctly. Did the Venetian interfere with the demonstrators' section 7 rights? Yes. "An employer's statement violates the NLRA if, considering the totality of the circumstances, the statement has a reasonable tendency to coerce or to interfere with [section 7] rights." *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001). We afford the Board deference in making this determination "recogniz[ing] the Board's competence in the first instance to judge the impact of utterances." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620 (1969). It is not difficult for us to conclude that the Board reasonably held that the Venetian's efforts to disrupt the demonstration were attempts to "interfere with [or] restrain" the demonstrators' "exercise" of their section 7 rights. Playing the trespass warning message and telling union agent Arnodo that he was under "citizen's arrest" each "had a reasonable tendency to . . . interfere" with the demonstration. Unfair labor practices have been found in similar efforts. *See United Food*, 222 F.3d at 1039 (grocery store's policy barring solicitation on sidewalks in which it lacked a sufficient property interest to do so violated the Act); *NLRB v. Calkins*, 187 F.3d 1080, 1083 (9th Cir. 1999) (threats to have nonemployee put under "citizen's arrest" for

handbilling and picketing violated section 8(a)(1)); *Wild Oats Markets, Inc.*, 336 N.L.R.B. 179, 181 (2001) ("It is beyond cavil that had the Respondent directly ordered the union representatives to cease picketing and vacate the premises . . . the Respondent would have engaged in unlawful interference with Section 7 rights."); *D'Alessandro's, Inc.*, 292 N.L.R.B. 81 (1988) (employer violated section 8(a)(1) by threatening arrest and posting a sign on its premises disallowing pickets). We decline, however, to decide whether the Venetian's summoning of the police violated section 8(a)(1). As we discuss next, the Venetian has argued that summoning the police was directly petitioning government and therefore protected activity. Because the Board did not address this argument, we cannot conclude that it was a violation of section 8(a)(1) without knowing the Board's reasoning.

Finally, we turn to the Venetian's argument that the Supreme Court's *Noerr-Pennington* doctrine should be extended to create a safe harbor for its actions. The doctrine provides that in certain contexts otherwise illegal conduct—such as concerted activity among business competitors—is protected by the First Amendment when it is part of a direct petition to government or "incidental" to a direct petition. The Supreme Court created the doctrine in the context of antitrust law. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136-38 (1961), the Supreme Court held that collaboration among railroad companies lobbying for legislation that would limit competition in the trucking industry did not violate antitrust laws because it was part of an exercise of their First Amendment right to petition the government. In *United Mine Workers of America v. Pennington*, 381 U.S. 657, 669-70 (1965), the Court held that the First Amendment protected mine operators and workers from antitrust laws when they collaborated to petition the Tennessee Valley Authority to increase minimum wages. The First Amendment protection was

not diminished in that case, even though the mine operators' purpose was to reduce competition by forcing smaller competitors out of business because they could not afford to pay higher wages. The *Noerr-Pennington* doctrine has since been used to "insulate[] from antitrust challenge competitors' decision to combine to petition the government, even if their underlying intention is to restrain competition or gain advantage over competitors." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 817 (D.C. Cir. 2001).

Central to the Venetian's argument here is the fact that the Court has not limited *Noerr-Pennington* immunity to the direct petitioning of government. Included within its ambit is conduct "'incidental' to a valid effort to influence governmental action." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (quoting *Noerr*, 365 U.S. at 143). *Noerr* itself immunized from Sherman Act liability activity that was not direct government petitioning. The protected activity in *Noerr* was the railroad industry's "publicity campaign" against the trucking industry that included "[c]irculars, speeches, newspaper articles, editorials, magazine articles, memoranda and . . . other documents." *Noerr*, 365 U.S. at 142.

Recognizing the importance of identifying articulable limits on the reach of the immunity created by *Noerr-Pennington*, the Court in *Allied Tube* attempted to explain the scope of protected "incidental" activity. *Allied Tube* involved the efforts of the Nation's largest steel electrical conduit manufacturer to influence a decision of the National Fire Protection Association ("NFPA"), a private, voluntary organization that promulgates the National Electric Code, which is routinely adopted by "[a] substantial number of state and local governments . . . with little or no change," *Allied Tube*, 486 U.S. at 495. The steel conduit manufacturer recruited individuals to join the NFPA who would vote against a competitor's proposal

to amend the code. The proposal was rejected, and the competitor brought suit alleging violation of the Sherman Act. *Id.* at 497. The steel conduit manufacturer defended by arguing that "because state and local governments rely so heavily on the Code and lack the resources or technical expertise to second-guess it, efforts to influence the [NFPA's] standard-setting process" were "incidental" to direct petitions of state and local governments. *Id.* at 502. In rejecting the steel conduit manufacturer's "absolutist position that the *Noerr* doctrine immunizes every concerted effort that is genuinely intended to influence governmental action," *id.* at 503, the Court explained that "incidental" activity is not protected by *Noerr-Pennington* if its "context and nature . . . make it the type of commercial activity that has traditionally had its validity determined by the antitrust laws themselves." *Id.* at 505. The Court found that given the "context and nature" of the steel conduit manufacturer's activity, it was "more aptly [] characterized as commercial activity with a political impact" that resembled conduct "normally held violative of the Sherman Act," and was therefore not entitled to *Noerr-Pennington* immunity. *Id.* at 507.

The Venetian urges us to extend *Noerr-Pennington*'s protection of "incidental" conduct to what it describes as its "pre-litigation activities," i.e., broadcasting the trespass message and attempting to make the "citizen's arrest."[8] It argues that this conduct was "incidental to and inextricably intertwined" with its lawsuit, which was, without question, a valid government petition. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed but one aspect of the right of petition."). In this respect, the Venetian asks us to follow the example of the Ninth Circuit,

---

[8] The Venetian argues that its summoning of the police was direct petitioning activity.

which recently applied *Noerr-Pennington*'s protection of "incidental" activity to shield a company's pre-litigation settlement demand letters from RICO liability. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006). The Supreme Court has extended *Noerr-Pennington* immunity into labor law only to protect direct petitioning, i.e., employer lawsuits, *see Bill Johnson's Rests. v. NLRB*, 461 U.S. 731 (1983); *BE & K Constr. Co. v. NLRB*, 536 U.S. 516 (2002); it has yet to do so in labor law for "incidental" conduct. We do not decide this question, however, because of the Venetian's inability to show that its conduct was in fact "incidental" to its lawsuit under the holding of *Allied Tube*.

To determine whether the Venetian's pre-litigation activities are protected as "incidental" conduct, we look to the "context and nature of [the] activity" to determine whether it is the type of activity "that has traditionally had its validity determined by the [NLRA itself]." *Allied Tube*, 486 U.S. at 505. The proper inquiry is whether the conduct can be characterized as typical "pre-litigation" activity, or is "more aptly [] characterized as [NLRA] activity" that happens to have an impact on litigation. *Id.* at 507. So stated, this is not a close call. The Venetian claims that its actions were "necessary prerequisite[s] to establishing the elements for injunctive relief," but cites to no case or statute that supports that contention. At oral argument, the Venetian's counsel made the claim that under the Nevada trespass statute, the property owner must give notice to the trespasser in order to establish a trespass claim. Although that may be true, it is irrelevant to this case because the Venetian never filed a trespass lawsuit. Its lawsuit sought an injunction and declaratory judgment—forward-looking relief. There is no evidence that this conduct is customary "pre-litigation" activity. However, this type of conduct has long been held to be governed by the NLRA. The "context and nature" of the Venetian's conduct shares more with the line of section 7 cases we have

cited, *see* cases cited *supra* p. 16, than it does with "pre-litigation" activity. It is worth noting what the Venetian asks us to do by expanding the scope of *Noerr-Pennington* immunity in labor law. Unlike many other contexts, expanding First Amendment protection in labor law for an employer's arguably expressive conduct may result in constricting the scope of employees' expressive activity protected by section 7. That is one reason why, as *Allied Tube* is so careful to point out, context matters when a party urges the expansion of *Noerr-Pennington*. *See Allied Tube*, 486 U.S. at 503-04 (citing a long list of prohibited antitrust conduct that would be protected if the Court accepted "petitioner's absolutist position that the *Noerr* doctrine immunizes every concerted effort that is genuinely intended to influence governmental action"). Were we to interpret *Noerr-Pennington* to protect an employer's conduct that has as little connection to actual petitioning activity as the Venetian's, we would effectively eviscerate the fundamental protection section 7 seeks to provide for expressive activities by labor unions.

The Venetian's reliance on the Ninth Circuit's opinion in *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006), is unavailing. The *Sosa* court held that a satellite television company was immune from liability under RICO for sending letters to individuals who had improperly tapped into its satellite signal. The letters demanded payment and threatened litigation in response to noncompliance. The court held this to be pre-litigation activity within the scope of the protection afforded by the *Noerr-Pennington* doctrine. 437 F.3d at 942. The Ninth Circuit had held that "in the litigation context, not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the prosecution of the suit' is protected by the *Noerr-Pennington* doctrine," *id.* at 934 (quoting *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528-29 (9th Cir. 1991)). That principle,

however, had been limited specifically to antitrust cases, *id.* at 937, and protected "incidental" conduct only "so long as [it was] sufficiently related to petitioning activity," *id.* at 935. In extending the doctrine to protect pre-litigation activities outside of the antitrust context, the *Sosa* court closely examined the relation between the "incidental" action—the demand letters—and the lawsuit, which was a lawful direct petition to the government. It determined that "the connection between presuit demand letters and access to the courts is sufficiently close" to apply *Noerr-Pennington* immunity. *Id.* at 936.

But *Sosa* is of no help to the Venetian. The holding there was limited to a narrow category of "incidental" activity: "[p]relitigation communication[] demanding settlement," that the court found had a "sufficiently close" connection to the lawsuit. *Id.* The *Sosa* court cited several reasons in support of this determination. The first two are telling. "First, preceding the formal filing of litigation with an invitation to engage in negotiations to settle legal claims is a common, if not universal, feature of modern litigation . . . . Second, many states, including California, protect prelitigation communications under statutorily granted litigation privileges." *Id.* By contrast, broadcasting the trespass warning message and making the "citizen's arrest" have nothing at all to do with the right to "access [] the courts." They are neither common features of litigation nor statutorily protected litigation privileges. Even were we to adopt the reasoning of the *Sosa* court as the Venetian urges, its argument would still fail because it cannot show that its "pre-litigation" activities are "sufficiently close" to its lawsuit.

Of the three activities the Board determined were unfair labor practices—summoning the police, broadcasting the trespass message, and attempting to effect a "citizen's arrest"—we conclude that broadcasting the trespass warning

message and trying to effect the "citizen's arrest" are not protected by the *Noerr-Pennington* doctrine. Venetian has failed to show that these activities were in any sense prerequisites to its lawsuit. Regarding the summoning of the police, the Venetian argues that was a direct effort to "influence . . . law enforcement practices," Petitioner's Br. at 24 (quoting *Noerr*, 365 U.S. at 144), and is therefore protected activity under the First Amendment. Because the Board did not address this argument in reaching its conclusion, we remand that issue for the Board's consideration.

## III.

We deny the Venetian's petition for review and grant the Board's cross-application to enforce its order in all respects except on the issue whether summoning the police was protected by the *Noerr-Pennington* doctrine. We remand that issue to the Board.

*So ordered.*